No. 21,990.

NELS ROSE and ELIZABETH ROSE, *Appellees,* v. THE CITY OF
GYPSUM, AMOS DEMY and S. E. KUHN, *Appellants.*

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATION—*Vested with Powers in Dual Capacity.* A
   municipality has a dual capacity—one as an agency of the state, in
   which it is vested with powers which are purely governmental, legis-
   lative and public; and the other which is proprietary, commercial,
   quasi-private and ministerial.

2. SAME—*Negligence of City—Officials Exercising Governmental Powers.*
   The rule followed that a city is not liable for the negligence of its
   officials in those matters which relate to the city's governmental
   powers as an agent of the state.

3. SAME—*Liability of City for Negligence of City Officials.* The duty of
   a city and its officials to forbid and prevent an automobile race on
   one of its streets and to provide police and protection against such
   misuse of the street is a governmental power and duty, and for negli-
   gence in the discharge of such duty the city is not liable, because there
   is no statute imposing such liability.

4. SAME. During a four days' street carnival in Gypsum City, an auto-
   mobile race was run on a public street. One car swerved, and struck
   and fatally injured one of the onlooking bystanders. In an action
   for damages against the wrongdoers, the city was also made a de-
   fendant on the theory that it was liable for the negligence of its
   officials "in allowing the race to be run and not providing police and
   protection." *Held,* that while all the wrongdoers are individually
   liable in damages, and criminally liable for manslaughter, the city of
   Gypsum City is not liable.

Appeal from Saline district court; DALLAS GROVER, judge.
Opinion filed March 8, 1919. Reversed.

*Z. C. Millikin,* and *A. H. Miller,* both of Salina, for the
appellants.

*C. W. Burch, B. I. Litowich,* and *LaRue Royce,* all of Salina,
for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiffs sued Gypsum City and a large
number of persons for damages on account of fatal injuries
sustained by their minor son, who was struck by an automobile
driven by one of the defendants in an auto race which was

held on a public road and street in and adjacent to Gypsum City.

Early in 1916, the local lodge of Modern Woodmen determined to hold a four days' carnival in Gypsum City in the month of August. A committee of the lodge obtained from the city government the right to use two blocks of Maple street for the carnival. The first grant was as follows:

"May 8th, 1916.

"Motion made and seconded that the M. W. A. have the use of Maple street from 5th street to 7th street except cross streets. Providing: Merry-go-rounds, Ferris-wheels or any other concessions requiring stakes or excavations shall not be placed in the street, also an opening shall be left for teams or autos to pass in day time, and, the street shall be cleaned after the picnic. Motion carried."

Later this permission was enlarged:

"5/22/16.

"Meeting called to order by Mayor Schmitter with the following councilmen present: J. S. Goodwin, L. H. Banks, J. W. Bean and T. R. Tinkler.

"Meeting was called to meet with a committee from the M. W. A. concerning the use of Maple Street during their annual picnic, the Committee reporting that they would like the use of Maple Street to place their Carry-us-all and Ferris-wheel in as they would require no wooden stakes or excavations. Motion made and seconded that in addition to privileges already granted the M. W. A. be allowed to place the Carry-us-all and Ferris-wheel in Maple Street under the supervision of the Street and Alley Committee. Motion carried."

The Woodmen's lodge and the leading people of the community made extensive preparations for the carnival, and it was widely advertised. A program was prepared and circulated. In part, it reads:

"PROGRAM M. W. A. CARNIVAL. GYPSUM, KANSAS.

AUGUST 9-10-11-12.

WEDNESDAY, AUGUST 9th.

2:00 p. m.—Band Concert.
3:00 p. m.—Ball Game.
4:30 p. m.—100 yard *Automobile Dash*, by dealers.
8:00 p. m.—Band Concert.
8:30 p. m.—Free Picture Show.

THURSDAY, AUGUST 10th.

FRIDAY, AUGUST 11th.

SATURDAY, AUGUST 12th.

10:30 a. m.—Grand Parade.

Prizes: 1st prize of $10 for best decorated automobile or float, 2nd prize $5. $2.50 for best Rag-a-muffin outlay.

2 to 3 p. m.—Band Concert.

3:00 p. m.—Ball Game.

4:30 p. m.—Free-for-all Trotting Race.

Prizes: $3.00 and $2.00.

*Dealers Auto Dash*, 150 yards.

8:00 p. m.—Band Concert.

8:30 p. m.—Free Picture Show."

The particular automobile races outlined in the program were not held, but on Saturday afternoon, the last day of the carnival, at the close of a base-gall game, it was informally announced that an auto race would be run. One eyewitness testified:

"The streets were full. A rope was stretched across the street at the north end of the concessions. . . . Another rope was stretched across the street at the other end of the concessions. I think the ropes were put up the second day, but they were taken down within a few hours. There was a ball game Saturday afternoon north and east of the street where the concessions were. It commenced between two and three o'clock. There were very few people left on the streets until the ball game was over, when they came back and went south up the street. I heard an announcement made of the automobile race through a megaphone. He said that a race would be held immediately south of the merry-go-round and for everybody to come. . . . The crowd followed and went on south down the street. But few remained about the concessions. In possibly an hour they carried my brother back and the crowd followed. . . . In some places there couldn't have been more than fifteen or twenty feet of street left between the concessions. . . . Maple Street runs north and south through the town. . . . Sixth Street is south of Fifth. I don't know who made the announcement of the auto race. They were strangers to me, everybody down there."

Another witness testified:

"I saw the automobile race late Saturday afternoon. It was on the half mile south of Gypsum. The race was run to the north. I do not know whether they were supposed to run one hundred fifty yards or two hundred, but I was pretty handy at the coming-out place. I saw the place where they started from by dodging around the crowd. There was quite a crowd there located on either side of the road. . . . Three machines started in the race. . . . They were driving at thirty or thirty-five miles an hour at the time they came out. I heard the noise

of the accident about three rods north of me and saw a shower of windshield glass.   .   .   ."

Another witness said:

"Well, I heard them go down the street hollering, 'An automobile race, to come to the automobile race,' so I followed the crowd. I was standing by the deceased when he was struck. I had been standing by him ever since the cars started from the other end. I was standing up beside him just kind of looking over his shoulder when he was struck. There were people thirty or forty feet south of me and there were people north of me and behind me. I was standing in the front row. I was standing back in the grass about that far, eighteen inches, I should judge. He was looking at the two cars that went by. He was standing about six inches ahead of me kind of sideways. The distance between the last one of those two and the third car was about thirty feet. The last car was only about six or eight inches from me. 'Why I seen it hit somebody, I didn't know it was Rose then. Up to that time I didn't know Rose personally.' He was thrown about eighteen or twenty feet. They did not have ropes or guards along there between the crowd and the roadway."

Among the trial court's instructions were the following:

"14. Under the law of this state it is the duty of the city to keep its public streets in a reasonably safe condition for street purposes; and if you find and believe from the evidence in this case that the defendant city knowingly permitted the use of one of its streets, or a part thereof, to be used for racing automobiles at a high rate of speed through crowds of people, then you are instructed that the city was negligent in not keeping such street safe for reasonable street purposes and it is liable for any injury occasioned by such negligence.

"15. If you find and believe from the evidence that the defendants, or any of them, with a common purpose, were engaged in a common enterprise for the furnishing of entertainment to visitors invited to attend such entertainment, and as a part of such enterprise the defendants so engaged negligently promoted and caused to be run an automobile race of two or more automobiles driven at a high rate of speed upon a public highway along the east side of Everhart's addition to Gypsum City, Kansas, on August 12, 1916, and negligently permitted the invited spectators to assemble in crowds along the sides of said highway in great numbers without affording policemen or other persons to guard such spectators and warn them back from danger and without barriers to protect them from such racing automobiles; and if you further find and believe from the evidence that such negligence on the part of the defendants or those of them so engaged in such common enterprise was the proximate cause of an injury to Carl Rose; and if you further find and believe from the evidence that the said Carl Rose was not guilty of negligence contributing to his injury, then the defendants in this action so engaged in such common enterprise are liable to the plaintiffs whether

or not they actively took part in or personally directed or managed or caused said automobile race to be run. . . .

"19. The court instructs the jury that the permission given the defendant lodge by the mayor and council of the city of Gypsum did not authorize the automobile race at which Carl Rose was injured."

The general verdict of the jury was in favor of the plaintiffs and against the defendant city and against Kuhn who managed the race and Demy who drove the car which fatally injured the plaintiff's son.

Certain special questions were answered:

"Q. 1. Did the defendants who have been left in the case by the court promote and cause an automobile race to be run at high speed upon a street and public highway without properly safeguarding invited spectators? A. Yes.

"Q. 2. What was Carl Rose's age when hurt? A. 15-16.

"Q. 3. Was he then a boy of ordinary understanding for one of his years? A. Yes.

"Q. 4. Did the Woodmen entertainment committee, consisting of J. S. Harris, Elmer Talbert and Earl Kuhn, as a committee, promote and control the automobile race which took place on August 12, 1916, at which Carl Rose was hurt? A. No.

"Q. 5. Prior to Saturday, August 12, 1916, did the said Woodmen entertainment committee decide not to hold the automobile race advertised in the handbills? A. Yes. . . .

"Q. 8. Was the automobile race run, the same race as advertised by the Woodmen entertainment committee? A. No. . . .

"Q. 18. Do you find the city of Gypsum or any of its officers guilty of negligence? A. Yes.

"Q. 19. If you answer the last question yes, state which of such defendants were guilty of negligence? A. City officials.

"Q. 20. If you answer question No. 18 in the affirmative, state separately what act or acts of negligence each of said defendants mentioned in your answer to 19 committed? A. In allowing race to be run and not providing police and protection.

"Q. 21. Do you find the remaining defendants or any of them guilty of negligence? A. Yes.

"Q. 22. If you answer the last question in the affirmative, state which of such remaining defendants you find guilty of negligence? A. S. E. Kuhn, Amos Demy.

"Q. 23. If you answer question No. 21 in the affirmative, state separately what act or acts of negligence each of such remaining defendants, as mentioned in your answer to 22, committed? A. S. E. Kuhn managed the race; Amos Demy participated in the race.

"Q. 24. Did the car which struck Rose during the race run on that portion of the highway not then within the corporate limits of Gypsum City? A. Both inside and outside."

Rose v. City of Gypsum.

The city appeals. Its principal contention is based upon the general proposition of law that a city in its public capacity as an agency of the state, and in the exercise of governmental functions, is not liable in damages for the negligence, misconduct, inaction or *ultra vires* actions of its city officials, except where positive statutes, like the mob statute (Gen. Stat. 1915, § 3822), and the act relating to the negligent enforcement of the prohibitory law (Gen. Stat. 1915, § 5556), have changed the general rule.

It will be noted that the trial court's instruction to the jury, No. 19, was that the permission given to the Woodmen's lodge to use the streets for their carnival did not authorize the automobile race. It will also be noted, although it might not materially affect this decision, that the race which caused the death was not promoted or controlled by the Woodmen's committee which had received the sanction of the mayor and council to hold the carnival in the city streets. (Jury's findings, Nos. 4, 5, and 6.)

The wrongdoing of the city is based upon findings Nos. 19 and 20, which are that the city officials were negligent, and their negligence consisted in allowing the auto race to be run and not providing police and protection. While the affirmative answers to questions 1 and 18, considered with the general verdict, would be independently construed as a general finding against the defendant city, yet findings 19 and 20 define and limit the city's wrongdoing, because these are the particularizations as to the city's misfeasance and nonfeasance, and these special findings control.

Is a city liable for the wrongdoing, official negligence or misconduct of its officers? That question has been considered, discussed and expounded so often by this court that there is nothing new to say on the subject. A city has a sort of dual capacity—that of a corporation whose concerns are particularly its own, and that of a local governmental agency of the state. In the former capacity it may be liable for the shortcomings of its officers and agents, as in the case of a railway or mining or manufacturing corporation. In its latter capacity, as a local agent of the state government, it is ordinarily not liable, because its principal, its superior and sovereign, is itself not liable. That is to say: the state has not by statute im-

posed a liability on itself for the delinquencies of its public servants; and with few exceptions, like the mob statute, the drunkard's statute, and the statutes relating to liability of counties and townships for defective roads and bridges, the state has not by statute imposed liability on its local governmental agencies for their negligent exercise or negligent discharge of purely governmental functions.

"It is a thoroughly established proposition that a city has a dual capacity—one as an agency of the state in which it exercises powers purely governmental, legislative and public; the other is proprietary, commercial and quasi-private. (*City of Wichita v. Railroad & Light Co.*, 96 Kan. 606, 608, 152 Pac. 768.) In the exercise of its governmental powers, whether that exercise be wise or foolish, just or unjust, it is never liable thereon in the absence of a statute imposing such liability. Of course in its other capacity, the proprietary, commercial and quasi-private one, it may be subjected to liabilities and judgments like ordinary private corporations and individuals." (*Water Co. v. City of Wichita*, 98 Kan. 256, 259, 260, 158 Pac. 49.)

The misfeasance and nonfeasance of the city officials which contributed to the death of the boy, and for which a liability on the city is imposed, were "in allowing the race to be run and not providing police and protection."

Do not these shortcomings relate to the governmental duties of the city and its officers? (1) "In allowing the race to be run." Here was governmental inaction, governmental delinquency. The city officials should have prevented the race. Why? Because the state has delegated to the city the power to forbid and to prevent races in public streets. It is a matter of state concern that the public be protected from such misuse of the streets. It might or might not be a matter of purely corporate concern; but the state forbids such use of public highways, and the only power the city had was the power of coöperative action to assist the state in preventing misuse of the streets. The court is of opinion that the city's delinquency in allowing the race to be run was a delinquency in its governmental capacity. (2) "In not providing police and protection." These shortcomings, too, were in the city's governmental inaction. An adequate police force to protect private individuals and private property ought to be provided by every city, but if a city fails in these respects it is not liable in damages for such negligence. No case in this jurisdiction, perhaps none in any American state, can be cited which has held a city liable where

Rose v. City of Gypsum.

its people have been harassed by burglars or highwaymen through the negligence of its police department; or because of fire losses through inefficiency in its public fire department. Good reasons might be advanced to fasten such liability on a city; it would cause the tax-paying electors to be alert as to their political duties, and might constrain a more zealous discharge of public duty on the part of city officials; but if ever such liability is fastened upon the cities of this state it must be done by the legislature, and cannot be done by the courts.

"Until the legislature changes the theory of our municipal institutions and creates a duty on the part of a municipality to open its treasury for the reimbursement of persons who suffer from misconduct on the part of its executive officers in the discharge of governmental functions, the courts are closed to actions prosecuted for that purpose." (*Everly v. City of Gas*, 95 Kan. 305, 307, 147 Pac. 1134.)

Thus it has been held that a city is not liable for damages caused by an explosion of dynamite caps which the city's employees had carelessly left on the premises of its detention hospital (*Frost v. City of Topeka*, 103 Kan. 197, 173 Pac. 293) ; nor where a child had been bitten by a wolf in an unguarded cage of a city zoölogical garden (*Hibbard v. City of Wichita*, 98 Kan. 498, 159 Pac. 399) ; nor where a boy was drowned in an unguarded city park (*Harper v. City of Topeka*, 92 Kan. 11, 139 Pac. 1018) ; nor because of injuries sustained through defective conditions and negligence in the maintenance of city jails and pest houses (*LaClef v. City of Concordia*, 41 Kan. 323, 21 Pac. 272; *Butler v. Kansas City*, 97 Kan. 239, 155 Pac. 12). Illustrations of this sort could be multiplied from references to our own reports without the need of borrowing citations from other jurisdictions.

But it is also true that there is a well-established field of municipal responsibility in which a city is liable for the negligence of its officers and employees. This field is properly limited to those ministerial powers and duties which chiefly concern the city as a corporation, and which have little or no relation to the city's functions as a governmental agency of the state. Thus, it is no particular concern of the state that a city should have streets and alleys and sidewalks running hither and thither, north, south, east and west, or otherwise, every few hundred feet within the city. Such matters concern only the convenience of the local inhabitants; and so there is a

superadded, ministerial, corporate duty that the city must maintain its streets, alleys and sidewalks in safe condition for public travel; and the city is liable in damages for injuries sustained by travelers or pedestrians which are caused by structural defects in the streets, or by obstructions, pitfalls, and the like.

"That a city is liable for any injury to private individuals, caused by the negligence of its officers in not keeping its streets in a safe and proper condition, has been maintained and promulgated by the supreme court of Kansas nearly ever since its first organization, and such is now the unquestioned doctrine in this state; and nearly all the courts of last resort in this country also recognize, sanction, approve and promulgate this very same doctrine." (*Gould v. City of Topeka,* 32 Kan. 485, 488, 489, 4 Pac. 822.)

Conforming to this general doctrine, it has been held that a city is liable for the negligent maintenance of an unguarded embankment on a public street (*Gould v. City of Topeka,* supra) ; for the negligent maintenance of a defective approach to a city bridge (*City of Eudora v. Miller,* 30 Kan. 494, 2 Pac. 685) ; for injuries sustained by a child which were caused by a dangerous piece of machinery which the city had negligently permitted to remain for a long time in an alley (*Osage City v. Larkin,* 40 Kan. 206, 19 Pac. 658) ; for negligence in failing to set lights and guards to warn travelers against a portion of a street torn up by plowing and excavations (*Tepfer v. City of Wichita,* 90 Kan. 718, 136 Pac. 317) ; for negligently permitting water to collect on a sidewalk, which changed to ice and caused a pedestrian to fall and who was injured thereby (*Spencer v. Kansas City,* 92 Kan. 161, 139 Pac. 1029) ; and among numerous other cases of the same general sort are *Garnett v. Smith,* 72 Kan. 664, 83 Pac. 615; *Rogers v. City of Coffeyville,* 95 Kan. 171, 147 Pac. 816; *King v. City of Parsons,* 95 Kan. 654, 149 Pac. 699; *White v. City of Bonner Springs,* 99 Kan. 148, 160 Pac. 1024; *Schaubel v. City of Manhattan,* 102 Kan. 430, 170 Pac. 984.

In *Malchow v. City of Leoti,* 95 Kan. 787, 149 Pac. 687, the city permitted a merry-go-round to be located for several days upon the intersection of two of the principal streets. It was staked and stayed by guy ropes, and was operated by an engine likewise stationed in the street, as was also a water tank for the engine and a supply of coal. In the opinion of the

court affirming a judgment against the city for damages to a person whose eyesight was destroyed by an explosion of the lubricating glass in the engine which operated the merry-go-round, the entire discussion of the city's liability relates to a city's liability for obstructions placed in the street, and the Kansas cases cited in support of the opinion (and the other citations also) are those which fix liability upon cities for obstructions and defects in the streets and sidewalks. The Malchow-Leoti case does not turn upon the question of a city's liability for misuse of the street, nor does that case qualify anything that this court has so often said touching a city's nonliability for the acts or delicts of its officials in relation to governmental duties. Counsel say that the discussion in *Everly v. City of Gas*, 95 Kan. 305, at pp. 307, 308, 147 Pac. 1134, touching the nonliability of a city for dereliction of its officers in matters of governmental concern, is dictum. It was illustrative and pertinent to the controlling question in that case, and is still more so to the controlling question in this case. Moreover, dictum is not necessarily bad law; it is often very good law. What are all the lengthy and learned expositions of legal principles written by Blackstone, Kent, and Story but *dicta?*

This so-called dictum in the Everly case was written by a master of the law of municipal corporations. Its precision, lucidity and pertinence here leave nothing for further amplification. It reads:

"An exception exists with reference to maintaining public streets and ways in a condition of safety for public travel. This duty is regarded as having been imposed directly upon the city. Being so imposed, the duty is ministerial in character and the city is responsible for negligence in discharging it. . . . In this connection it may be observed that the liability of a city for the condition of its streets extends to structural defects, obstructions, want of repair, and the like, making travel upon the street dangerous. It does not extend to improper and unreasonable uses of the highway contrary to governmental ordinances enacted for the convenience and safety of the traveling public, and the city is not liable for breaches of such ordinances although committed with the knowledge or even the participation of its officers. For example, if the mayor of a city, its commissioner of streets and its chief of police were to act as starter, judge and timekeeper of an automobile race on its principal street at a time when the street is crowded with people, the victims of the unlawful enterprise would have no right of action against the city. It has been so held in numerous cases involving coasting, bicycle riding, horse racing, and other forbidden conduct." (pp. 307, 308.)

The doctrine just quoted is the law of this state, and only the legislature can change it. The court has not overlooked the cases from other jurisdictions which the industry of counsel for plaintiffs has called to our attention, but such cases cannot be countenanced to unsettle or change the law of this state.

It is useless to consider the other questions presented in this appeal. The persons, city officials and private citizens alike, who promoted, aided or abetted in the running of the automobile race which caused the death of plaintiff's son, are all personally liable in damages for the boy's death; they are also criminally liable for manslaughter; but the city of Gypsum is not liable.

So far as concerns the city of Gypsum the judgment is reversed, and the cause remanded with instructions to enter judgment for the city.

JOHNSTON, C. J., dissents.

BURCH, J., did not participate in this decision.