No. 28,276.

THE MUNICIPAL POWER TRANSMISSION COMPANY, *Appellant,*
v. THE CITY OF LYNDON, *Appellee.*

(272 Pac. 158.)

Opinion filed December 8, 1928.

*F. M. Harris* and *W. S. Jenks,* both of Ottawa, for the appellant.

*C. G. Messerley,* of Osage City, and *A. K. Stavely,* of Lyndon, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the Municipal Power Transmission Company to compel specific performance of a contract of the city of Lyndon to purchase and pay for electric current. The court returned findings of fact and conclusions of law pursuant to which judgment was entered for defendant. The findings of fact and conclusions of law follow:

"1. That the cities of Lyndon and Quenemo are cities of the third class,

under the laws of the state of Kansas, and that the plaintiff is a corporation duly organized and doing business under the laws of said state.

"2. That prior to March 30, 1922, and for a short time thereafter, Lyndon was the owner of and operated an electric light plant for the benefit of said city and its inhabitants, and also furnished electric current to the city of Quenemo and the city of Melvern, for the benefit of said cities and their inhabitants.

"3. That sometime prior to March 30, 1922, Quenemo was the owner of a transmission line between the city of Quenemo and the city of Lyndon, over which Lyndon furnished electric current to Quenemo, and which transmission line was about said time purchased and rebuilt by Lyndon.

"4. Electric current generated in Lyndon was furnished to the city of Melvern, another city of the third class located near by. The service to the towns of Quenemo and Melvern was under contracts by such cities with a private corporation which in turn purchased the current so used from Lyndon.

"5. The generating plant of the defendant was found not to be adequate, and beginning as early as 1920 requests were made of the mayor and council of Lyndon to improve such service. On October 4, 1920, the records of the city show that a petition signed by A. B. Crum and sixty-four others was presented to the city council, asking that the city proceed with as much haste as possible to furnish citizens with 24-hour service, either by change in the city generating plant or purchase of current elsewhere.

"6. On October 1, 1921, the city of Quenemo entered into contract with the city of Ottawa, Kan., under the terms of which it was to buy electric current for the city and its inhabitants from the city of Ottawa, and arranged to build a new transmission line from Ottawa to Quenemo to transmit such current. Such contract appears in evidence.

"7. At the time the city of Quenemo arranged for the building of its new transmission line to Ottawa, it was planned to take down the transmission line owned by Quenemo and connecting it with Lyndon, and use the materials from that line in the building of the new line, and to build such new line of merely sufficient weight and capacity to carry the electric load necessary for Quenemo.

"8. On November 7, 1921, at a regular meeting of the council of Lyndon, the following action was taken:

" 'Motion by Swisher, seconded by Rogers, that the city of Lyndon, through its mayor and council, buy the transmission line owned by the city of Quenemo and extending from the city of Lyndon to the limits of Quenemo, for the sum of $3,500, and acceptance of the offer of the city of Quenemo to supply current delivered on the switchboard at the city of Quenemo to supply current delivered on the switchboard at the city of Lyndon for 4½ cents a kilowatt, the purchase and acceptance, however, conditioned upon the electors of the city voting bonds of the city of Lyndon in the sum of $10,000. The city attorney was instructed to draw an ordinance calling an election to vote bonds of the city of Lyndon in the sum of $10,000 to purchase and equip the transmission line from Lyndon to Quenemo. Motion was adopted.'

"9. That shortly thereafter the city of Quenemo built a transmission line from Quenemo to the city of Ottawa, Kan.

"10. On November 14, 1921, the following appears on the records of the minute book of the council of Lyndon:

" 'The council of the city of Lyndon met in the office of the city clerk November 14, 1921, with the councilmen of the city of Melvern. Ways and means of securing 24-hour service were discussed, and the two cities mutually agreed upon a plan by which current could be secured from Quenemo.'

"11. On December 12, 1921, a resolution was duly adopted by the mayor and councilmen of the city of Lyndon as follows:

" 'Whereas, the mayor and councilmen of Lyndon, Kan., for the purpose of supplying the city of Lyndon, Kan., and its inhabitants with electric lights, have entered into a contract with the mayor and councilmen of the city of Quenemo, Kan., to purchase the electric transmission line extending from the city of Lyndon to the city of Quenemo, and to extend and equip such transmission line with new insulators, meters, transformers, a third wire, and such other equipment necessary for a three-phase service,

" 'And whereas, the city of Lyndon, Kan., by the terms of such agreement with said city of Quenemo, Kan., has become liable to the city of Quenemo, and has obligated itself in the amount of $10,000 for the purchase aforesaid, and

" 'Whereas, an indebtedness to the amount of $10,000 has been created by the city of Lyndon in the manner and for the purpose aforesaid:

" 'It is therefore resolved and determined by the mayor and councilmen of the city of Lyndon, Kan., that the indebtedness so created be paid by the issuance of bonds of said city of Lyndon in the amount of $10,000, as provided in section 864, General Statutes of 1915.'

"12. That on said December 12, 1921, ordinance number 265 of the city of Lyndon was duly passed. This was an ordinance calling an election of the electors of the city of Lyndon to vote bonds for the purpose of purchasing an electric line to the city of Quenemo, Kan., for the purpose of transmitting electric current to said city of Lyndon.

"13. Due notice of such election was given by publication in the manner provided by law, and such election was held on January 2, 1922. On January 3, 1922, the mayor and councilmen of the city of Lyndon met to canvass the votes cast at such election. In the record of such meeting the following appears:

" 'Council proceeds to canvass votes according to law cast at special city election held on January 3, 1922, submitting the following propositions:

" 'Proposition No. 1: A proposition to vote bonds of the city of Lyndon to the amount of $10,000 for the purpose of purchasing lines of wire, poles, and other equipment and appurtenances connecting the city of Lyndon with the city of Quenemo, Kan., for the purpose of procuring or supplying electric lights for the city of Lyndon and its inhabitants.

" 'Total number of votes cast................................ 262
For the proposition ........................................ 210
Against the proposition .................................... 48
Void ballots ............................................... 1
Blank ballots .............................................. 3'

"The mayor and councilmen at such meeting declared that such proposition was duly carried.

"14. That upon January 24, 1922, ordinance number 267 of the city of Lyndon was duly passed. This ordinance provided for the issuance of bonds of the city of Lyndon to the amount of $10,000, for the purpose of purchasing the transmission line from the city of Quenemo to the city of Lyndon.

"15. That upon March 6, 1922, the mayor and councilmen of Lyndon duly authorized the city clerk to secure the services of Prof. F. Ellis Johnson as constructing engineer in the equipment of such transmission line from Lyndon to Quenemo. Mr. Johnson made a survey of the line, and presented to the mayor and councilmen of Lyndon at regular meeting a written report concerning the rebuilding of the line. This report was accepted, and the transmission line was rebuilt, under the direction of Mr. Johnson (for the purpose of securing thereover electric current from Quenemo to Lyndon).

"16. That after such bond election, an instrument was prepared covering the furnishing of electric current from Quenemo to Lyndon at the rate of 4½ cents per kilowatt metered at the switchboard in Lyndon. This instrument was discussed by the mayor and council of Quenemo and signed by the mayor and city clerk with the seal of the city attached. This purported contract was sent to and taken up by the mayor and councilmen of Lyndon at a meeting, but the evidence does not show what formal action was taken thereon. The mayor and city clerk of Lyndon testified that all the councilmen of the city of Lyndon at this meeting expressed themselves as being satisfied with the purported contract; following such meeting both of said original purported contracts were signed by the mayor and city clerk of Lyndon, one copy was returned to Quenemo and filed with the city clerk, the other was retained by the city clerk of Lyndon.

"17. That the journal of the proceedings of the city councils of said cities of Quenemo and Lyndon contain no record of any action having been taken by the governing body of said cities authorizing the execution of said written instrument.

"18. That the oral testimony of A. W. Logan, the then mayor of the city of Quenemo, who signed said instrument as mayor Quenemo, and also of D. R. Morris, who was at that time one of the councilmen of the city of Quenemo, shows that said instrument was agreed to and authorized by the city council of the city of Quenemo (by unanimous vote of the council).

"19. That the oral testimony of C. T. McDaniel and J. H. Yearout, the then mayor and city clerk of the city of Lyndon, and who signed said instrument as such mayor and clerk, shows that no vote was ever taken by the city council of Lyndon on the adoption of said instrument, but that all of the councilmen, at a regular meeting of the council, expressed themselves as favorable to the provisions of said instrument.

"20. That at the time of the execution of said instrument, and for several years prior thereto, the city of Quenemo did not own or operate an electric light plant for the production of electric current (but did own a system of poles, wires, transformers, and insulators, by which it distributed electric current to its inhabitants and lighted its streets).

"21. That said purported contract between Quenemo and Lyndon was never

published in the official city paper of the city of Lyndon or elsewhere, prior to its execution.

"22. That Quenemo, by ordinance No. 154 of said city of Quenemo, with the agreement thereto attached and marked 'A', attempted to assign said purported contract to the plaintiff herein, and also sold and transferred to plaintiff all of its lines, poles, transformers, electric equipment, and its transmission line between Quenemo and Ottawa.

"23. That thereafter plaintiff gave to defendant a notice of its acquisition from the city of Quenemo of said property, by a letter to the city clerk of Lyndon.

"24. That thereafter no formal action was taken by the governing body of the city of Lyndon consenting to the assignment of said purported contract by the city of Lyndon.

"25. On May 1, 1922, the city of Lyndon paid to the city of Quenemo the sum of $3,500 for the transmission line from Lyndon to Quenemo and took possession thereof. Under the direction of Professor Johnson the city of Lyndon then proceeded to expend the greater portion of the remainder of the proceeds of the sale of the bonds in the rebuilding of said transmission line. All of said expenditures were authorized by the mayor and council of Lyndon (and were made for the sole purpose of securing electric current from Quenemo).

"26. That because of the fact that Lyndon and Melvern were to take their current from Quenemo, said city of Quenemo built its transmission line from Ottawa of such capacity to carry an additional load, at an increased cost of $5,000.

"27. Said transmission lines were completed sometime about August, 1922, and service commenced to be furnished thereover during that month. About September 1, 1922, the city of Lyndon paid to the city of Quenemo the first monthly bill for electric current furnished. Such bill was computed at 4½ cents per kilowatt, metered at Lyndon, Kan., and monthly thereafter, until the city of Quenemo sold its electrical property to the plaintiff as hereinafter stated, the city of Lyndon paid to the city of Quenemo for electric current which it received during the preceding month. All of such bills were computed at the rate mentioned above. During all such time the city of Lyndon did not question the validity or effect of the purported contract between said two cities. Such bills were allowed by the mayor and councilmen at regular meetings.

"28. During the month of May, 1925, the plaintiff purchased all of the electrical property of the city of Quenemo, including the rights of Quenemo under the purported contract with Lyndon. This sale was approved by the public service commission of Kansas and the plaintiff authorized to engage in the utility business with relation to such property. The plaintiff took possession of such property in July, 1925, and in writing notified the city of Lyndon of its purchase of such property and the assignment of said contract to it, and that it would faithfully fulfill such contract. Such city made no objection thereto, and beginning with the month of August, 1925, the city of Lyndon paid to the plaintiff the monthly bills for electric current furnished to it by the

plaintiff. All of such bills were computed upon the rates given above, and were allowed at regular monthly meetings of the mayor and council, and payments made direct to the plaintiff.

"29. That the chief consideration which induced the cities of Quenemo, Lyndon and Melvern to join in taking current from Ottawa was the mutual benefit to be received by them in furnishing electric current to their respective inhabitants.

### "CONCLUSIONS OF LAW.

"1. That the purported contract between Lyndon and Quenemo was entered into by Lyndon without authority of law, and is void.

"2. That the purported contract between Lyndon and Quenemo was entered into by Quenemo without authority of law, and is void.

"3. That Quenemo had no right to assign said contract to the plaintiff herein, and that plaintiff has acquired no rights thereunder.

"4. That the defendant, the city of Lyndon, is not estopped to assert the invalidity of said contract by reason of having accepted and paid for current thereunder.

"5. That the plaintiff is not entitled to the relief sought, and the injunction should be denied."

The first conclusion of law is based on the twenty-first finding of fact. Chapter 136 of the Laws of 1903 empowered cities of the second and third classes to obtain water, heat, light and power. Sections 1 and 2 related to the granting of franchises to persons, companies and corporations to perform the service. Section 3 related to performance of the service by municipalities themselves, and enabled them to make contracts to that end. Publication was not required of either franchise ordinances enacted under section 1, or of contracts entered into under section 3. In 1909 what is now R. S. 12-841, relating to franchises, was substituted for sections 1 and 2 of the earlier act, and those sections were repealed. The new law required publication of franchise ordinances, and under certain conditions referendum elections. Section 3 was not affected in any particular, and cities remained free to contract without publication, as before.

Section 3 of the act of 1903 did not empower cities to purchase electric current. In 1911 the section was amended by including that commodity among those which cities might purchase, and the section became R. S. 12-842. No publication limitation was placed on the power to contract, there is no such limitation, and the first conclusion of law is unsound.

By R. S. 12-842 the city was authorized to supply electric current by means of a plant purchased or constructed and operated by the

city itself. The city was also granted full power and authority to contract for and purchase electric current to be delivered (to the city) where purchased or elsewhere, and to maintain wires and other equipment for distribution of current from place of delivery to such points within or without the city as might be desirable, for the purpose of supplying "said city, its citizens and others" with light, power, or heat for domestic use "or other purposes." The city was also authorized to place its distribution wires and other equipment on public roads, highways, and streets of the state. Under this grant of power the city could buy electric current. It could buy current to supply its own corporate needs. It could also buy current to be supplied to citizens of the city and others, which of course means it could sell purchased current. "Said city and its citizens" embraces all the territory within the corporate limits. The word "others" has no meaning unless it applies to purchasers outside the city limits, and the courts have no authority to strike the word from the statute. The legislature placed no restriction on classes of purchasers indicated by the word "others," or on localities. Under the *ejusdem generis* canon of interpretation the city could supply current to other cities and to other than its own citizens, which is sufficient for this case. Application of the canon is not needed, however, to know that the city could sell to outside corporations, whether public or private.

The end which the legislature had in view was wide distribution of electric current through municipal agency at a time antedating such service by private corporations. The statute of 1903 provided, as it still does, that a city may purchase natural gas wells, may secure natural gas lands by lease, contract, or purchase, may purchase natural gas, and may construct and maintain pipe lines for transportation of natural gas to supply the city, its citizens, and others with natural gas. In providing for future needs a city having access to a natural gas field would likely produce and have at its disposal a surplus of gas, which it could pass on to other cities less fortunately located and thus enable them to share nature's bounty. No distinction was made between a city producing gas from its own wells and lands and a city purchasing its gas. The result was that, for example, producing city Ottawa could sell in large volume to Quenemo, Quenemo, purchasing at an economic advantage, could supply Lyndon, which would otherwise be without gas, and Lyndon could supply Melvern. Apparently the legislature was satisfied with

the result of this extension of normal municipal function, because in 1911 power to buy and sell gas was extended to include electric current. The statute, being a remedial public-welfare statute having a purpose beyond the mere government of an incorporated city, is to be liberally construed.

As indicated, R. S. 12-842 applied to cities of the second and third classes only. Cities of the first class were not included. In 1911 and 1913 the following statutes were enacted:

"All cities of the state owning their own electric-light, heat or power plant are hereby authorized and empowered to furnish electric light, heat or power to districts lying outside of the limits of such cities, and charge for such service such rates as may be provided by ordinance.

"Any city operating waterworks, fuel, power, or lighting plant may sell and dispose of water, fuel, power or light to any person within or without said city." (R. S. 12-806 and 12-808.)

These statutes contained initial grants of corporate power to cities of the first class, and may or may not have been regarded as enlarging the statutory powers of other cities operating their own plants. The statutes were not restrictive of any power enjoyed by cities of the second and third classes, and took nothing from the power of cities not operating producing plants to buy and sell electric current. Besides that, the lines, poles, transformers, and other equipment of Quenemo, constructed, operated and sold to the transmission company, constituted a distribution plant, and by liberal interpretation might be said to constitute a plant operated by Quenemo, within the meaning of the 1913 statute, the purpose of which clearly was to broaden to the fullest extent the field of electrical distribution. The result is, the second conclusion of law is unsound.

The third conclusion of law was based on R. S. 12-1649, which reads:

"That any city of the second or third class possessing any equipment, machinery, apparatus or personal property that its governing body desires to sell, trade or exchange for other property better suited to the city's needs, or to use the cash received therefor in purchasing such other property, may dispose of the same, and in the event of receiving cash in the transaction, deposit the proceeds thereof in the general fund of the city."

The section applies to the specific kinds of transactions enumerated. It has no application to the outright sale by Quenemo to the transmission company of Quenemo's property, including the contract with Lyndon, made with no purpose to acquire other property

better adapted to the city's needs, whether with cash received or otherwise. Such sales have been authorized since 1872:

"Each city shall be a body corporate and politic, and shall have power:

. . . . . . . . . . . . . .

" 'Third. To sell and convey any real or personal estate owned by the city, and make such order respecting the same as may be deemed conducive to the interests of the city, and to provide for the improvement, regulation and government of the same.' " (R. S. 12-101.)

Lyndon contends the contract was not assignable because of the special trust and confidence which Lyndon reposed in Quenemo. The court did not so find. The twenty-ninth finding is that the contract was induced by expectation of mutual benefit to be derived from it. On Lyndon's side the contract was entered into because its plant had broken down, and electric current could be procured from Quenemo. The subject of assignment of the contract was considered when the contract was negotiated. Lyndon was expressly prohibited from assigning without Quenemo's consent. No restriction was placed on assignment by Quenemo. The result is, the third conclusion of law is unsound.

The fourth conclusion of law is clearly unsound. The contract was entered into by Lyndon by virtue of its private business power, and not as a public governmental matter. Lyndon performed for three years before the assignment by Quenemo to the transmission company became operative, and for more than two years afterward. Both cities had power to contract and to perform, and informalities in making the contract were cured by performance.

Lyndon is also estopped, even if it be conceded Quenemo lacked power to contract. The contract on Quenemo's side was not illegal or immoral. It was simply unauthorized. Quenemo sold and assigned the contract to the transmission company, the sale was approved by the public service commission, and the transmission company notified Lyndon of the sale and of the transmission company's purpose to perform. No impediment to contract between Lyndon and the transmission company existed. Notwithstanding the original defect of power on Quenemo's side, the contract was not a complete nullity. It had valuable potentiality.

"Though the act under which a city contracted with complainant for the furnishing of gas for 25 years at a fixed rate was invalid, yet, where the validity of the contract was for many years recognized by municipal authorities after the enactment of a new charter, under which it would have been valid, the city cannot thereafter question the contract." (*Omaha Gas Co. v. City of Omaha,* 249 Fed. 350, 351, syl. ¶ 5.)

"Where city, in reliance on contracts with power company to furnish it with electricity at specified rates, dismantled its own power plant, and the company recognized the validity of the contract by furnishing electricity thereunder for more than five years, and until after the enactment of a statute empowering the city to enter into such a contract, the company subsequently thereto was estopped from claiming that the contract was void because *ultra vires* at the time it was entered into." (*Central Power Co. v. Central City, Neb.*, 282 Fed. 998, syl., C. C. A. 8th Cir.)

In the hands of the transmission company the contract was capable of ratification by Lyndon. Lyndon chose to treat the contract as valid and binding, and continued for two years to perform on its side. Common honesty forbids repudiation now.

It follows from the foregoing that the fifth conclusion of law is unsound.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for plaintiff on the findings of fact.