Hinze v. City of Iola.

No. 18,767.

OTTO HINZE, *Appellee*, v. THE CITY OF IOLA et al., *Appellants*.

### SYLLABUS BY THE COURT.

1. ELECTRIC LIGHT PLANT—*Operated by City—Highest Care Required*. A city which operates an electric light plant and furnishes electricity to its patrons for lights acts in its proprietary capacity and is held to the highest care to avoid injury to such patrons.

2. SAME—*Personal Injuries—Defect in Wires—Notice to the City*. Notice to a commissioner of such city between two and three o'clock that there was something wrong with the electricity in the vicinity of a building 100 feet from the plaintiff's meat shop, the current in both buildings being controlled by the same transformer, required prompt attention and justified the jury in finding the city negligent in not preventing an injury to plaintiff in his shop two or three hours later, caused by a defect in such transformer.

3. SAME—*Manner of Turning off Current—Not Contributory Negligence*. The plaintiff had been in the habit of turning off the current by means of a thumb piece on the cord suspended from the ceiling and not by means of a switch located elsewhere in the room. On finding that the meat was heavily charged with electricity it was not negligence on his part at once to attempt to cut off the current by turning such thumb piece.

4. SAME—*Special Findings—Answer "We Don't Know" Construed*. When in answer to a question how long a certain condition had existed the jury answer "We don't know," this means not that such condition did not exist at all or for any certain time, but that the evidence fails to show the duration of such existence.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed July 7, 1914. Affirmed.

*H. A. Ewing, S. A. Gard, G. R. Gard,* and *Chris S. Ritter,* all of Iola, for the appellants.

*Frank R. Forrest,* and *B. E. Clifford,* both of Iola, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff recovered a judgment against the city for damages received by an electric shock in his place of business. He alleged that the city was operating a light plant and supplying its citizens with electricity for lights; that over the wires strung upon the poles on the streets and alleys a current approximating 2200 voltage was passed while only about 110 voltage was required for lights for each consumer; that along the main light wires were installed transformers consisting of iron boxes in which were placed coils of insulated wire directly connected with the power plant; that to further protect the users from an overcharge each transformer must be kept filled with a good quality of oil and kept in repair, which requires frequent inspection; that if they should become empty or should not contain the proper quality of oil or get out of repair the result would be to overcharge the insulated wires of each consumer; that at the point of entrance where the defendant's wires connect with the building of the consumer the consumer has attached to his insulated wires small switches with a thumb piece used by the consumer to shut off or turn on the current for light; that near the plaintiff's place of business was an electric light pole on which was placed a transformer which on December 9, 1911, became dry, having absorbed the oil therein, and out of repair, thereby permitting an increased voltage of from 1000 to 2000 volts to pass over the wires in plaintiff's place of business; that about five o'clock P. M. the plaintiff drove up to the

meat market and was informed by an employee that there was something wrong with the wires in the sausage room, in which room was a lamp cord, and the plaintiff, taking hold of the thumb-button switch attached thereto to turn off the current, received a severe shock of electricity which knocked him to the floor, causing the cord to fall upon him and injuring him. It was expressly charged that the city officers and commissioners had full knowledge of the defect and full advice of the condition at 1:30 P. M. of the date in question, but took no steps to repair the defect or correct the condition. The jury in answer to a question as to whether the transformer was empty of oil at the date in question answered, "Don't know," but proceeded to find that it was out of repair on that date the defect being due to "lack of oil or worn insulation."

"Q. If you find that the transformer was empty of oil or out of repair, state how long it had been in that condition. A. We don't know."

They also found that one of the commissioners was notified between two and three o'clock from the creamery that something was wrong in that vicinity with the electricity, and that the person or persons in charge of the meat market discovered that the meat was charged with electricity between two and three o'clock.

"Q. No. 28. Did any of the city's officers or employees have any notice or knowledge of any defect or of anything being wrong with the electric equipment or current at the plaintiff's meat market before the plaintiff alleged that he sustained the injuries complained of? A. No."

The same transformer that controlled the current in plaintiff's shop also controlled the current in the creamery, the two places being about 100 feet apart. So, when the report was received, between two and three o'clock, that there was something wrong with the electricity in that vicinity it was practically the same as if the report had come from the shop, and the city, knowing that both places were affected by the same

transformer, was made aware that attention should be given at once to the matter complained of. The city commissioner who received the report testified that he told a lineman he should have some one go and look it up. "Afterwards I got a report that some one was sent up there but I never found out who it was. Further than that I know nothing about it." According to the counter-abstract, he testified that the stenographer was told to ask what the trouble was and was answered that "they would get a charge from touching either of the wires," and "I went in the hall and put an order on the file telling Mr. Curtis the condition and made out a work order to that effect and told him to go up there and look at it and see." There was testimony that if the transformer did not have the proper quality of oil the effect would be to charge the consumers' wires with excessive voltage, and if a lack of oil was allowed to continue this would have a similar effect. It was testified that the transformer was repaired the morning after the injury. One witness, a general electrician who had been in the electrical business about twelve years and was familiar with the electricity used by cities like Iola for making lights, described the nature and operation of transformers, and among other things stated:

"The voltage on the secondary wires might be increased by means of dropping down insulation where the primary leads enter the transformer box, or a dropping down of the insulation where the secondary leads come out of the transformer box, or by an improper amount of oil in the transformer box, which would allow the two currents to char the insulation on the two coils. They should be attended to, because it is a dangerous proposition. They ought to be inspected frequently. They frequently get out of repair."

From the foregoing it appears that when the commissioner was notified, between two and three o'clock on the day of the injury, in the manner and to the effect testified to by him, the city thereby had notice

that the transformer controlling the current in the plaintiff's place of business needed immediate attention, and the finding by the jury that there was no notice or knowledge of any defect or anything being wrong with the equipment or current at the plaintiff's meat market before the injury occurred, while doubtless literally true, does not militate against the fact as shown by the other findings and the evidence that two or three hours before the injury the city had such notice and information as if made use of would have put it in full control of the situation at the meat market as well as at the creamery. Hence the answer "We don't know" to the question how long the transformer had been empty of oil or out of repair can not as a matter of law be deemed, as counsel suggest, a finding in effect that it had not been long enough to amount to notice to the city. When a jury are asked as to the existence of a fact and answer that they do not know, the logical and legal significance is that the plaintiff has not proved that such fact exists, and therefore, so far as his proof is concerned, it does not exist. Of such answers it has been said:

"They imply a denial of the existence, or perhaps more correctly of proof of the existence, of the facts concerning which the questions were propounded." (*Morrow et al. v. Comm'rs of Saline Co.,* 21 Kan. 484, 504; *Railway Co. v. Hale,* 64 Kan. 751, 754, 68 Pac. 612.)

. (See, also, *Croan v. Baden,* 73 Kan. 364, 85 Pac. 532; *Jolliff v. Railway Co.,* 88 Kan. 758, 129 Pac. 1178.)

But when the question is how long a certain condition existed, the answer "We don't know" necessarily means, not that such condition did not exist at all or for any certain time, but that the evidence fails to show the duration of such existence.

The city in furnishing electricity to its patrons was acting in its proprietary capacity, and was liable for damages caused by its negligence. (*Emporia v. White,* 74 Kan. 864, 86 Pac. 295; *Davoust v. City of Alameda,*

149 Cal. 69, 84 Pac. 760, 9 Ann. Cas. 847, Note, p. 851, 5 L. R. A., n. s., 536; Note, Ann. Cas. 1912B, 817; Note, 20 L. R. A., n. s., 648.) The duty of the city is to exercise the highest care to avoid injury to its customers. (*Railway Co. v. Gilbert*, 70 Kan. 261, 78 Pac. 807; *Winegarner v. Edison*, 83 Kan. 67, 109 Pac. 778.) The jury were justified in finding generally that the defendant fell short of its duty in this instance.

It is contended that the plaintiff by his contributory negligence precluded himself from the right to recover. The jury found that he was told by his employee that there was something wrong with the electricity in the meat room, and that he entered, took hold of the meat or something, and received a shock, but they also found that after this he did not take hold of the light wire in use in the room; that it was hanging in the same room until he received a shock and pulled it down; also, that there was a switch for turning off the current; that he knew its location, and there was nothing to have prevented his throwing it. But these matters were all for the jury to consider and do not, as a legal proposition, bar his recovery. The plaintiff testified that he was not familiar with the quantity, strength or force of an electric current; that when he touched a sparerib he got an electric shock, "had not then touched any wire; . . . touched it and was knocked down; extension wire was on that light, hung over the 2 by 4 all wound up; when I went to shut it off it knocked me down and I jerked the cord down with it; the button was to shut off the light, nothing else. Knew then where the switch was; never thought of any switch; knew at that time that the switch was to shut off the entire current; did n't want to cut off the entire current; there was nothing to prevent him from going and turning off the switch; did n't want to turn it off."

In direct examination he said:

"I reached over on the wires and I just picked up the cord hanging down, and in doing so it knocked me down."

On cross-examination:

"There was thumb button for that wire; touched it and was knocked down."

On redirect examination, after stating that he undertook to turn the current off at the thumb button, he was asked, "And after that, you took hold of this wire; you did n't take hold of the wire, you took hold of the switch or little button there?" and answered, "Yes, sir; I took hold of the little button there." It appeared by other evidence that the switch had not been used, but instead the button on the cord, when it was desired to turn off the current. While the plaintiff stated on the stand that before he touched the thumb piece he had touched the meat and it "liked to have burned my finger all up," and he said "that will kill somebody," we do not think this shows negligence on his part in immediately attempting to shut off the current in the way he had been in the habit of doing, by turning the thumb piece on the suspended cord; and from the entire account of the incident the jury were warranted in finding in the plaintiff's favor.

We have carefully considered each point presented, but find no material error in the record.

The judgment is therefore affirmed.