No. 32,726

A. H. SNOOK et al., *Appellees,* v. THE CITY OF WINFIELD, *Appellant.*

(61 P. 2d 101)

Opinion filed October 10, 1936.

*S. C. Bloss* and *Stewart S. Bloss,* both of Winfield, for the appellant.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *Wm. E. Cunningham,* all of Arkansas City, for the appellees.

The opinion of the court was delivered by

BURCH, C. J.: Plaintiffs sued for damages for the death of their daughter, Stella Mae Snook, from electricity alleged to have been negligently furnished by defendant. A jury trial resulted in judgment for plaintiffs for $4,500. Defendant has appealed.

The city of Winfield is a city of the second class operating under the commissioner-manager form of government. It owns and operates gas, water and electric utilities. It sells electric energy to those within or outside the city who desire to use it. About 1917 it constructed a high-tension electric line, carrying 6,600 volts, several miles west of the city, where it had electric pumps for its waterworks. It sold electric energy to persons living near this line who desired to purchase it. In 1924 the plaintiff, A. H. Snook, and his neighbor, Earl Caldwell, farmers who live near this high line and about five miles from Winfield, desired electric energy for use in their homes. Caldwell went to the city manager, a Mr. Welfelt, and made the arrangements for its use. Welfelt told him that they would have to pay the expense of building the line from their houses to the high line, including the cost of the transformer to reduce the current for their use to 110 volts, and of course wire their own premises. He told Caldwell the kind of a transformer, wires and other equipment to be used; in fact, he either purchased this for them, or furnished it to them from the city's supply, bills for which were presented by the city to Caldwell and Snook and paid by them. Snook and Caldwell bought the poles from the telephone company and set them. Perhaps also they strung the wires. They had their respective houses wired by doing the work themselves, or having someone other than the city do it. When that was done they notified the city manager. He sent the city's agents and employees out to put in the transformers. They also put a meter in at each residence, for which the consumers made a deposit to the city, and inspected the line and its construction. They told Snook and Caldwell that if anything went wrong with the circuit not to attempt to fix it themselves, but to notify the city. The understanding or agreement was that the city would furnish to them the same service and charge the same rates for electricity used as it furnished and charged patrons who resided in the city. After this was done the city began furnishing them with electricity. About the 15th of each month someone from the city electric department would read the meters, the

city furnished the consumers a statement of the amount used, and Snook and Caldwell paid their respective bills. There was very little trouble with the service. Whenever there was trouble the city was notified and promptly sent one or more of its men, who corrected the trouble. It never presented a bill for any services performed by its men in keeping this line and equipment in repair. There were times when something would go wrong with the radio or some of the other equipment in the house and it would be taken to some electrician for repairs instead of to the city. It seems there were times, also, when minor troubles about the equipment would be repaired by Snook or Caldwell. In 1931 for a time there was quite a little trouble. The city was notified of that and sent out its men, who inspected everything and made such repairs as they found necessary, and among other things took away the transformer then in use and installed another from the city's warehouse. Thereafter the major troubles ceased and the service went along with only minor difficulties, corrected in each instance by the city when its attention was called to it, until about the middle of September, 1933. There developed then what seemed to be more than normal difficulty. Fuses blew out more frequently, the lights sometimes alternated from excessive brightness to dimness, and there was evidence that at the Snook home the meter at times ran backwards. When the city's representative read the meter, September 14th or 15th, Mrs. Snook told him that at times the meter ran backwards. At the particular time they were looking at it the meter was not running at all. One effect of this would be that the meter would not show as much current as actually passed through it. The reading on that date was about half of what it was the month before. The meter reader stated that this indicated something wrong, which apparently he did not know about, and nothing appears to have been done about it. At the Snook home, in addition to using electricity for lights and some household appliances, it was used to pump water. The well was in a basement with a cement floor under the house. The well was about 25 feet deep, and it was perhaps 15 feet from the basement floor to the water. There was an electric pump arranged to work automatically so as to bring the water up through a galvanized pipe in the well for use in the house. It was the only one of the electrical appliances that was in the basement. The Snooks kept their refrigerator in the basement, where they also had cupboards or bins for canned fruits and vegetables.

By the last of September, 1933, both Caldwell and Snook were having trouble with the electricity. Caldwell had a well and pump in his basement. The motor for the pump burned out. He took it to an electrician in town to have it repaired. On Saturday night, the last day of September, there was quite a rain and electric storm. All of the electrical equipment at both of these places ceased functioning. The city was notified, and about eleven o'clock Sunday morning three men from the city electric-light department came to the Snook home. They had stopped at the transformer, where they had put in fuses and cleaned off some caked oil and dust from the transformer. They put in fuses at the Snook home. There the insulation had been burned from the electric wires which led from the ceiling of the basement to the electric pump. The city's men put on new wires and connected them up. Perhaps they did some other work about there. Mr. Snook told them there was something wrong or there would not have been such an electric current on his appliances. He told them the meter was running backwards, and had been at times. One of the city's men said to the others, "That means a grounded current," and the others agreed with him. It does not appear that any efforts were made by them to find where this grounded current came from. After they had made repairs and connected up the electricity it seemed to function all right and they went back to town. On Monday morning the radio burned out at the Snook home. Mr. Snook took it to an electrical shop in town to have it repaired. When he brought it home Wednesday evening he noticed smoke coming out of his basement. He went to the basement and found that the insulation had been burned off of the wires from the pump to the ceiling—about three and one half feet. He disconnected those wires. That night their electric lights seemed to work all right. The next morning the family ate breakfast early, as was the custom. Directly after breakfast Mr. Snook went to a neighbor's, where he was to do some work that day. The son went to work about the place near the house. The daughter was doing up the work. Mrs. Snook was not feeling well and lay down. The daughter went to the basement with the butter and other things to be put in the refrigerator. Mrs. Snook heard a crash, as if something had fallen. She called her daughter and, getting no response, went to the basement and found the daughter lying on the basement floor near the pump. She was dead. There was a burned place across the inside of her hand, deeper on the little

finger. The basement ceiling was about six feet from the floor, which was always more or less damp about the pump. When Mr. Snook had disconnected the wires from which the insulation had been burned from the pump the evening before he had looped them up on something near the ceiling. Apparently the daughter's hand had in some way come in contact with that wire. It is conceded in this case that she died from an electric shock. An electrician, with many years' experience, from Arkansas City, was called. With a meter used for that purpose he tested the electricity on the two wires designed to carry power to the pump, then disconnected from it, and found the current to test 115½ volts, which is regarded as not unusual for what is commonly called the 110-volt current. He then made a connection from one of those wires to the pump. His instrument would test only 150 volts. The current was so strong that it could not be measured with the instrument he had. The hand was thrown against the pin and bent. He then started to reach down to pick up his meter, which was setting on the pump, and in doing so touched his thumb to the wire and received a severe electric shock, which almost knocked him over, and knocked the meter out of his hand. While he had no way of testing the voltage of that shock he knew it was a high-voltage current of electricity, and estimated it as anywhere from 2,000 to 4,000 volts. He testified that the heavy voltage was coming through the ground; it did not come through the overhead wire. He examined the fiber blocks in the switch block on the pump and found it had been perforated by a high voltage of electricity. It would take a thousand volts, or better, to do that under perfect conditions. He also made some examination of the transformer and saw that the crossarm on the pole appeared to have been smoked, and that the ground about the wire which led from the transformer was baked, as though an unusual amount of electricity had gone into the ground. He testified that damp ground was a good conductor of electricity, that it would sometimes travel through the ground long distances. The transformer was located about 45 rods from the Snook house. He gave it as his judgment that the strong current of electricity on the pump had come under ground from the transformer.

At the Caldwell place there was also evidence of a strong electric current on his pump. When Mr. Caldwell undertook to adjust a screw on the pump with his pliers they were thrown from his hand across the basement and he received a severe shock. On Saturday

morning, October 7, the city sent men out, who made a more thorough examination of the transformer. They found the porcelain in it was broken, and that the wire which carried current through a part of it, and which was composed of about fifteen strands, was burned or broken, all but one or two strands. They took the transformer out and put in the one which had been originally placed there, which in the meantime had been repaired, and since then, to the time of the trial of this case, there has been no serious trouble with the service on the line. The broken porcelain and wire which the city's employees found in the transformer on Saturday, October 7, were old breaks, not new ones. The jury would have been justified in believing, as perhaps it did, that the city's men would have found these defects in the transformer when they examined it on Sunday, October 1, if they had made as careful an examination then as they did on October 7.

While this statement of the facts omits many details shown by the evidence, we think it sufficiently comprehensive to present the issues involved. There is no serious controversy over the amount of the judgment if plaintiffs are entitled to recover; hence it is not necessary to state the evidence as to the amount of damages.

We turn now to the legal questions governing the case. When a city in its proprietary capacity goes into the business of generating electric energy and selling it to its inhabitants and others it is liable for its negligence in conducting the business to the same extent and under the same circumstances as a private corporation would be. This is well settled in this state and elsewhere. (43 C. J. 420, 421; 19 R. C. L. 1109; Curtis on The Law of Electricity, p. 629; *Hinze v. City of Iola,* 92 Kan. 779, 783, 142 Pac. 947.) Electric energy is an exceedingly dangerous commodity, and one who generates and distributes it is bound to exercise care commensurate with such danger. (*Railway Co. v. Gilbert,* 70 Kan. 261, 78 Pac. 807; *Followill v. Gas & Electric Co.,* 113 Kan. 290, 293, 214 Pac. 430; *Worley v. Kansas Electric Power Co.,* 138 Kan. 69, 75, 23 P. 2d 494.) These principles are not seriously controverted in this case.

Appellant's main contention on this appeal grows out of the fact that Snook and Caldwell paid the cost of constructing the line and installing the transformer from which electricity was taken from the city's high line, and also at their own expense wired their buildings and put in their electrical equipment. Appellant argues that when a producer of electricity delivers it at a certain point to a consumer

or distributor who has constructed the lines and equipment for its distribution, and where the one who generates and sells the electricity has no ownership or control over the distributing lines, and no notice that they are out of repair, it is not liable for injury or damage which occurs on the distribution lines or equipment. Appellant cites *Hoffman v. Power Co.*, 91 Kan. 450, 138 Pac. 632, which applied the rules contended for by appellant. There are other authorities to the same effect. The facts of the case before us, however, distinguish it from the Hoffman case and others of like import in two important respects—control over the distribution lines and equipment, and knowledge that there is a defect therein. The actual ownership of the distribution lines is comparatively unimportant insofar as liability is concerned. The principal thing is the control of its upkeep and repairs. Here, while it is true that Snook and Caldwell paid for the construction of this line, after it was constructed the city took charge of it for the purpose of distributing electricity over it. Snook and Caldwell were told if anything went wrong with it not to try to do anything with it themselves, but to inform the city; that it would look after troubles on the line. In this case the city manager testified that the city intended to give these customers the same service given to customers in the city. The city had done that ever since the line had been built. It had taken out one transformer and put in another without saying anything to Snook or Caldwell about it, and at various times had made repairs necessary for the proper functioning of the electric current it sold them.

Irrespective of ownership or control of the distribution lines and appliances there is testimony that defendant knew there was something seriously wrong at the Snook place. As early as the middle of September its meter reader was informed that the meter at times ran backwards, and expressed the view that it indicated something was wrong, which apparently he did not understand, and the cause of which defendant made no investigation to determine. On Sunday, October 1st, three of defendant's men were at the Snook place to investigate the trouble and make repairs. They found fuses blown out at the transformer and at the Snook home, and replaced them. They found the insulation burned off the wires leading to the pump in the basement, which would not have happened with the use of a normal 110-volt current. They were told that the meter sometimes ran backwards, and discussed this among them-

selves and agreed that it indicated a ground current. They replaced the burned wires leading to the pump, apparently making no effort to find the source of the excessive current which had burned them. Neither did they make any effort to find the source of the ground current which sometimes got into the meter and caused it to run backwards. With knowledge of these defects the city continued to supply electricity to the Snook home. Even if one who generates and sells electricity does not own or control the wires or apparatus over which it is distributed or used the exercise of due care requires that it should not supply electricity over known defective wires or appliances. These facts distinguish the case before us from the Hoffman case and others of like import.

Quite a little is said in the argument as to how the execessive current of electricity got into the Snook home and the appliances. A test of the wires leading from the transformer to the Snook home on October 1st and on October 7th showed only the standard 110 volts of electricity passing over those wires. On October 5th, the day of the death of plaintiffs' daughter, the electrician from Arkansas City, testing the wires leading from the meter at the Snook home to his appliances, found them to be carrying only what is recognized as the standard 110 volts of electricity. These tests indicated that the excessive voltage of electricity did not come into the Snook home over the wires from the transformer. There is evidence, however, that there was electricity in the Snook home which did not come in over those wires. A ground current caused the meter to run backwards at times, and on October 5th, when examined by the electrician from Arkansas City, the electric current on the pump in the basement at the Snook home was stronger, certainly more than 1,000 volts, and estimated at from 2,000 to 4,000 volts. He testified this electricity could have come through the ground from the transformer 45 rods away. Defendant's witnesses gave no credence to that view. Their testimony was to the effect that when electricity is turned into the ground it tends to neutralize itself; that it seeks the way of least resistance; that one cannot tell in advance in what direction it will go, and that it would be unusal for it to travel underground from the transformer to the pump in Snook's basement. The theory that a heavy charge of electricity put into the ground at one point might travel underground to another and cause damage has been considered in a few cases. See *Kansas City v. File*, 60 Kan. 157, 55 Pac. 877, and *Burdick v. South County*

*Public Service Co.,* 54 R. I. 310, 172 Atl. 893, where verdicts predicated upon such view have been sustained. Here there was evidence to support that view. We cannot say, as a matter of law, that it should be disregarded. Appellant contends that this is purely speculative and argues that a verdict should not be sustained which is predicated upon pure conjecture or speculation, citing *Hendren v. Snyder,* 143 Kan. 34, 53 P. 2d 472. But that can hardly be said here. It is conceded that plaintiffs' daughter came to her death from an electric shock. There is no contention that the electricity which caused her death came from any source but that generated by the defendant. The ordinary 110-volt current of electricity is not strong enough to cause the death of a normal person under ordinary circumstances, although death has been known to result from it. But here there is evidence that the pump was charged with a much stronger current, and the charge would have extended to the damp cement floor near it. Appellant argues that the death of plaintiffs' daughter was from the normal 110-volt current, and that there is no evidence that her death was caused by an excessive current. We think that contention is not sustained.

Appellant complains of some of the language used by the court in its instructions. We have examined these instructions carefully and find them to be fully as favorable to defendant as the record warrants.

Appellant requested the court to submit nine special questions to the jury. The court submitted two of them and declined to submit the other seven. Appellant complains of that ruling. The questions the court declined to submit related to matters that were not in controversy. It was not error for the court to refuse to submit them.

We find no error in the case. The judgment of the court below is affirmed.