No. 47,363

MARVIN G. BROWN, SR., et al., *Appellants,* v. WICHITA STATE UNI-
VERSITY, et al., *Appellees.* MIKE BRUCE, et al., *Appellants,* v.
WICHITA STATE UNIVERSITY, et al., *Appellees.* HALLIE EUGENIA
ROBINSON, Individually and as the Administratrix of the Estate of
Eugene Robinson, et al., *Appellants,* v. WICHITA STATE UNIVERSITY,
et al., *Appellees.*

(540 P. 2d 66)

Opinion filed June 9, 1975.

*John W. Norman,* of Lampkin, Wolfe, Burger, Abel, McCaffrey & Norman, of Oklahoma City, Oklahoma, argued the cause, and *Ronald D. Heck,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, and *David W. Kennedy,* of Greene & Kennedy, of Wichita, were with him on the brief for appellants.

*Paul Swartz*, of Martin, Pringle, Schell & Fair, of Wichita, argued the cause, and *J. Taylor Neuschwander* of the same firm was with him on the brief for appellee.

The opinion of the court was delivered by

FATZER, C. J.: This is an appeal from an order of the district court sustaining the defendant-appellee Wichita State University's motion for summary judgment.

The appeal arises out of the crash of a chartered aircraft carrying members of the 1970 Wichita State University football team, members of the faculty and university supporters. The plaintiffs—the appellants—are either surviving passengers or the personal representatives of those killed in the crash. The chronology of events giving rise to this action follows:

On July 21, 1970, an Aviation Services Agreement was exceuted by Golden Eagle Aviation, Inc., and Wichita State University for the period commencing September 11, 1970, and ending November 14, 1970—the scheduled 1970 football season. That agreement, attached as Appendix A to this opinion, was executed by Bruce J. Danielson on behalf of Golden Eagle, and by Bert Katzenmeyer, Athletic Director of Wichita State University on behalf of that institution. It was attested to by Floyd W. Farmer, Secretary of Wichita State University Physical Education Corporation Inc.

For convenience of the reader the defendant Wichita State University is hereafter referred to as the appellee, Wichita State University, Wichita State, WSU or the University; the defendant Wichita State University Physical Education Corporation, Inc., is hereafter referred to as Physical Education Corporation or PEC.

Pursuant to the terms of the agreement, Golden Eagle was to provide a qualified flight crew and other ancillary services for the aircraft to be used by Wichita State in transporting the members of its football team and other personnel to scheduled games at other universities. Wichita State was to lease the aircraft described in the agreement as "One Douglas DC-6B" from a third party and to provide passenger liability insurance as prescribed by federal regulations.

On Friday, October 2, 1970, members of the Wichita State football party departed Wichita, Kansas, in two Martin 404 aircraft for Logan, Utah, for a football game with Utah State University scheduled for Saturday, October 3, 1970.

When the Martin 404 aircraft, No. N464M, took off from Denver,

Colorado, an intermediate stop, it was 2,900 pounds in excess of the allowable taking-off weight as prescribed by aircraft specifications of the Federal Aviation Administration. (1 Nat'l. Trans. Safety Bd., 1028 [1971].) For those aboard that plane, the journey ended in tragedy when the plane crashed into a mountainside near Silver Plume, 16 miles west of Georgetown, Colorado.

The registered owner of the plane that crashed was Jack Richards Aircraft Company, Inc. No written agreement had been executed with respect to the lease of the plane to Wichita State for this flight. Written agreements leasing aircraft of Jack Richards to Wichita State for the first two away games of the 1970 football season had been signed by Mr. Katzenmeyer on behalf of the University. Those leases had been executed prior to each flight.

Golden Eagle Aviation, Inc., and Jack Richards Aircraft Company, Inc., were organized pursuant to the corporate laws of the state of Oklahoma. As a result of an investigation into the operation of Golden Eagle occasioned by the plane crash, Golden Eagle's air taxi/commercial operator certificates were revoked by the Federal Aviation Administration. That revocation was sustained on appeal by the National Transportation Safety Board. (1 Nat'l. Trans. Safety Bd., 1028 [1971].)

After the plane crash, it was ascertained Wichita State had not purchased the passenger liability insurance as required in its contract with Golden Eagle. Liability insurance requirements for air taxi operators engaged in transportation are set by regulations of the Civil Aeronautics Board. (14 C. F. R. 298.41 *et seq.* Subpart D.) The minimum limits of liability coverage are seventy-five thousand dollars ($75,000) for any one passenger, and for each occurrence an amount equal to the sum produced by multiplying $75,000 by seventy-five percent (75%) of the total number of passenger seats in the aircraft. (14 C. F. R. 298.42 [a] [1].)

On September 29, 1972, three separate lawsuits were filed. Each lawsuit involved multiple plaintiffs and named as defendants Wichita State University and the Wichita State University Physical Education Corporation, Inc. Prior to being taken into the state educational system on July 1, 1964, Wichita State was a municipally owned and operated educational institution known as the University of Wichita. (K. S. A. 76-3a01, *et seq.*) As a state educational institution, the University is an agency of the state of Kansas (K. S. A. 1971 Supp 76-711 [a], hereafter cited and referred to as K. S. A. 1974 Supp. 76-711 [a]) which is controlled by and operated under

the supervision of the Board of Regents. (K. S. A. 1971 Supp. 76-712, hereafter cited and referred to as K. S. A. 1974 Supp. 76-712.)

Defendant Physical Education Corporation is a nonprofit, non-stock corporation organized under the laws of the state of Kansas. The record shows this corporation was formed to conduct the business and other transactions of the intercollegiate athletic programs of Wichita State University. During oral argument we were advised the corporation was designed to make more palatable the channeling of tax funds to support intercollegiate athletics.

In their petitions, plaintiffs alleged several causes of action which sound both in tort and contract. The tort actions are based upon theories of negligence, breach of implied and express warranty and strict liability. The contract action is based upon the third party beneficiary doctrine and relates to the failure of Wichita State to obtain liability insurance as required by the Aviation Services Agreement and pertinent federal aviation regulations. The three lawsuits were consolidated by the district court.

On December 26, 1972, defendant Wichita State moved the district court to enter summary judgment in its favor. The defendant Physical Education Corporation was not a party to that motion, nor is it a party to this appeal. Briefs were filed by the parties. Attached to Wichita State's brief were the depositions of Dr. Clark D. Ahlberg, President of the University, and Mr. Bruce Lowe, Assistant to the President for Finance and the Business Manager of Wichita State. Following a hearing on defendant's motion, the district court held: (1) the governmental immunity statutes, K. S. A. 46-901 *et seq.*, were constitutional and barred plaintiffs' tort and implied warranty claims against Wichita State, and (2) assuming for purposes of the summary judgment motion, Mr. Danielson, acting in good faith on behalf of Golden Eagle, believed Mr. Katzenmeyer to be the agent of Wichita State and authorized to enter into the Aviation Services Agreement on its behalf, the agreement was an unenforceable contract and plaintiffs could not maintain an action against the University as third party beneficiaries. From that order, plaintiffs have perfected this appeal. We reverse.

It is an established principle of contract law that a person may avail himself of a promise made by a second party to a third party for the benefit of the first party although the first was not a party to the contract and had no knowledge of it when made. (*Keith v. Schiefen-Stockham Insurance Agency, Inc.*, 209 Kan. 537, 498 P. 2d 265; *Anderson v. Rexroad*, 175 Kan. 676, 266 P. 2d 320.) A valid and

binding contract is essential to the right of the third party bene-ficiary to maintain such an action. (*Cory v. Troth,* 170 Kan. 50, 223 P. 2d 1008.) Wichita State concedes the plaintiffs are third party beneficiaries to the contract between Golden Eagle and its "cus-tomer." However, the University asserts it is not the "customer" in fact or in law. As hereafter indicated, we hold that by the express terms of the Aviation Services Agreement, and disclosures thereon, the agreement is a contract between Golden Eagle Aviation and Wichita State University. Wichita State contends, however, that as applied to the University, the agreement is not a valid and binding contract. In support of that proposition, the University advances several legal theories.

The first theory advanced by Wichita State concerns its authority and the authority of Bert Katzenmeyer to enter into the agreement. Wichita State contends it did not have the approval of the Board of Regents as required by K. S. A. 1971 Supp. 76-721, hereafter cited and referred to as K. S. A. 1974 Supp. 76-721, to execute the agree-ment, nor did it grant Bert Katzenmeyer authority to execute the agreement on its behalf. Wichita State maintains Mr. Katzenmeyer had authority only to execute contracts on behalf of PEC. In con-junction with this argument, Wichita State asserts a mutual mistake was made in identifying the true contracting parties in the agree-ment. According to the University, the parties involved knew the agreement was with PEC and not Wichita State.

Wichita State also contends it did not, nor could it, ratify the Aviation Services Agreement. Here, it points out Mr. Katzenmeyer was contracting on behalf of PEC, that he was not acting as the agent of Wichita State, that all benefits under the agreement inured to PEC and ratification of the agreement was impossible because Wichita State lacked authority to enter into the contract unless it complied with the provisions of K. S. A. 1974 Supp. 76-721. Wichita State further contends that as an agency of the state, it cannot be estopped to deny the validity of the agreement.

The appellants contend the Aviation Services Agreement was entered into by Wichita State, that Mr. Katzenmeyer had ap-parent authority to execute the agreement on behalf of the Univer-sity and it should be estopped from asserting Katzenmeyer's lack of authority to bind the University contractually. (K. S. A. 1971 Supp. 76-725, hereafter cited and referred to as K. S. A. 1974 Supp. 76-725.) The appellants also contend that if no agency relation-ship existed between the parties, this court should "pierce the

corporate veil" of PEC and hold Wichita State responsible for its acts. The appellants also contend Wichita State's failure to follow statutorily required procedures regarding approval by the Board of Regents should not render a contract invalid where performance had already begun, and where there existed no indication of disapproval of the contract until after the crash. Finally, it is contended the University ratified the contract.

While this court has, on prior occasions, disregarded a corporate entity when it was necessary to promote justice or to obviate inequitable results (*Kellogg v. Douglas Co. Bank,* 58 Kan. 43, 48 Pac. 587; *Avery v. Safeway Cab, T. & S. Co.,* 148 Kan. 321, 80 P. 2d 1099; *Kilpatrick Bros., Inc. v. Poynter,* 205 Kan. 787, 473 P. 2d 33; *Kirk v. H. G. P. Corporation, Inc.,* 208 Kan. 777, 494 P. 2d 1087; *Meehan v. Adams Enterprises, Inc.,* 211 Kan. 353, 507 P. 2d 849; *Farha v. Signal Companies, Inc.,* 216 Kan. 471, 532 P. 2d 1330), we find it unnecessary to apply the alter ego doctrine here.

We are confronted in this appeal with two issues regarding the Aviation Services Agreement. First, we must determine the relationship between the three parties, Katzenmeyer, PEC, and Wichita State, and in so doing, determine who the contract is between, Golden Eagle and Wichita State, or Golden Eagle and PEC. Second, whether noncompliance with the provisions of K. S. A. 1974 Supp. 76-721 renders the agreement invalid. For the statute to apply, it is elementary that Wichita State must be a party to the Aviation Services Agreement. Accordingly, we shall consider first the relationship question.

The law recognizes two distinct types of agencies—one actual, and the other ostensible or apparent. What constitutes agency and whether there is any competent evidence reasonably tending to prove such a relationship is a question of law. (*Greep v. Bruns,* 160 Kan. 48, 159 P. 2d 803; *Shugar v. Antrim,* 177 Kan. 70, 276 P. 2d 372; *Hendrix v. Phillips Petroleum Co.,* 203 Kan. 140, 453 P. 2d 486.)

To determine whether the record establishes an agency by agreement it must be examined to ascertain if the party sought to be charged as principal has delegated authority to the alleged agent by words which expressly authorize the agent to do the delegated act. If there is evidence of that character, the authority of the agent is express. If no express authorization is found, then the evidence must be considered to determine whether the alleged agent possesses implied powers. The test utilized by this court to deter-

mine if the alleged agent possesses implied powers is whether, from the facts and circumstances of the particular case, it appears there was an implied intention to create an agency; in which event, the relation may be held to exist, notwithstanding either a denial by the alleged principal or whether the parties understood it to be an agency. (*Rodgers v. Arapahoe Pipe Line Co.*, 185 Kan. 424, 345 P. 2d 702.) In 2A C. J. S., Agency, § 52, p. 626, it is stated:

"An implied agency must be based on facts for which the principal is responsible. These facts must, in the absence of estoppel, be such as to imply an intention to create the agency, and the implication must arise from a natural and reasonable, and not from a forced, strained, or distorted, construction of them. They must lead to the reasonable conclusion that mutual assent exists, and be such as naturally lead another to believe in and to rely on the agency. The existence of the relation will not be assumed.

"While the relation may be implied from a single transaction, it is more readily inferable from a series of transactions.

"On the question of implied agency, it is the manifestation of the alleged principal and agent as between themselves that is decisive, and not the appearance to a third party or what the third party should have known. An agency will not be inferred because a third person assumed that it existed, or because the alleged agent assumed to act as such, or because the conditions and circumstances were such as to make such an agency seem natural and probable and to the advantage of the supposed principal, or from facts which show that the alleged agent was a mere instrumentality.

"The existence of a valid express contract for services as an agent precludes the implication of a contract covering the same subject-matter, and resort to an express provision in a contract relative to agency precludes any determination that there was an implied agency."

The doctrine of apparent or ostensible authority is predicated upon the theory of estoppel. An ostensible or apparent agent is one whom the principal has intentionally or by want of ordinary care induced and permitted third persons to believe to be his agent even though no authority, either express or implied, has been conferred upon him. (*Greep v. Bruns*, supra; *Theis v. duPont, Glore Forgan Inc.*, 212 Kan. 301, 510 P. 2d 1212.)

Ratification is the adoption or confirmation by a principal of an act performed on his behalf by an agent which act was performed without authority. The doctrine of ratification is based upon the assumption there has been no prior authority, and ratification by the principal of the agent's unauthorized act is equivalent to an original grant of authority. Upon acquiring knowledge of his agent's unauthorized act, the principal should promptly repudiate the act; otherwise it will be presumed he has ratified and affirmed the act. (*Theis v. duPont, Glore Forgan Inc.*, supra, and cases

cited therein.) Knowledge of the unauthorized act is essential for the principal to ratify the act, and must be shown or facts proved that its existence is a necessary inference therefrom.

The liability of a principal for the negligent acts of his agent is determined by whether the agent was engaged in the furtherance of the principal's business to such a degree that the principal had the right to direct and control the activities of the agent. (*Hughes v. Jones,* 206 Kan. 82, 476 P. 2d 588.) Liability of the principal is grounded upon the doctrine of *respondeat superior.* (*Jacobson v. Parrill,* 186 Kan. 467, 351 P. 2d 194.) The primary factor to be considered is the control which the principal has over the agent.

The function of PEC, as stated by the appellee, is to conduct the business affairs and other related transactions associated with the intercollegiate athletic programs of Wichita State. The chairman of the Board of Directors of PEC is appointed by the president of Wichita State and is a member of the University's faculty. Several other board members are either on the faculty of, or associated with, Wichita State. Those board members are also appointed by the University's president. A faculty member of the University accompanied teams of Wichita State when it participated in athletic events at other universities. Mr. Katzenmeyer was the athletic director of the University, as well as an executive for PEC, and was appointed by the president. His salary was paid by the University. Wichita State admits Mr. Katzenmeyer was authorized to execute contracts on behalf of PEC. Moreover, the record clearly shows the president directed Katzenmeyer to award contracts for transporting its athletic teams by means of competitive bids. It is apparent from the facts the University could, and did, on several occasions, direct and control the activities of PEC. The natural, reasonable implication that arises when these and other facts are considered is that the parties intended to create an agency relationship. Accordingly, we hold PEC to be the agent of Wichita State, and that Mr. Katzenmeyer, as an officer of the corporate agent, had the implied power and authority to bind the principal—Wichita State University. Hence, Wichita State is subject to liability for any negligent acts of its corporate agent under the doctrine of *respondeat superior.*

The foregoing conclusion is not intended to prohibit interested alumni, through an individual or organized effort, from assisting in activities conducted by, or in the name of the University. We hold, however, the University cannot purposely delegate to a corporate

entity, or otherwise, its responsibility for conducting intercollegiate athletic activities, directly control that corporate agent and then disclaim any liability. (K. S. A. 1974 Supp. 76-725.) Moreover, the facts disclose the University maintained such a close relationship with PEC so that it could be considered a mere instrumentality of the University.

Wichita State contends noncompliance with the provisions of K. S. A. 1974 Supp. 76-721 renders the Aviation Services Agreement invalid. We do not agree. K. S. A. 1974 Supp. 76-721 reads:

"The board of regents, or any university or college with the approval of the board of regents, may enter into contracts with any party or parties including any agency of the United States or any state or any subdivision of any state or with any person, partnership or corporation if the purpose of such contract is related to the operation or function of such board or institution. If such contract is with a corporation whose operations are substantially controlled by the board of any college or university, such contract shall provide that the books and records of such corporation shall be public records and shall require an annual audit by an independent certified public accountant to be furnished to the board of regents and filed with the state agency in charge of post auditing state expenditures."

Wichita State argues the statute is mandatory and its clear, concise language requires that a university must have approval of the Board of Regents before entering into any contract, and the Board of Regents did not approve the Aviation Services Agreement. Absent such approval, the appellee contends, the contract is void and unenforceable.

No absolute tests exist by which it may be determined whether a statute is directive or mandatory. Each case must stand largely on its own facts, to be determined on an interpretation of the particular language used. (*Wilcox v. Billings,* 200 Kan. 654, 438 P. 2d 108; *State v. Brown,* 205 Kan. 457, 470 P. 2d 815.) It can be said the Legislature does not intend any statutory provision to be totally disregarded. If the consequences of not obeying a particular statute are not prescribed by the Legislature, then this court must decide the consequences. (*City of Kansas City v. Board of County Commissioners,* 213 Kan. 777, 518 P. 2d 403.)

The Legislature has delegated to the Board of Regents the authority to control, operate, manage and supervise the universities and colleges of this state. "For such control, operation, management or supervision, the board of regents may make contracts and adopt orders, policies or rules and regulations and do or perform such other acts as are authorized by law or are appropriate for such

purposes." (K. S. A. 1974 Supp. 76-712.) The provisions of K. S. A. 1974 Supp. 76-721 fix a method of procedure intended to secure order, system and dispatch in contracting with state educational institutions. Its provisions are directive, and as such, require implementing rules or regulations by the Board of Regents. No policy, rule or regulation of the Board of Regents has been cited or furnished to this court regarding contract matters, and none can be found in the Kansas Administrative Regulations. Wichita State asserts the contracting procedure of the University is to have a contract for goods or services first approved by a designated person at the University, then approved by the Department of Administration (K. S. A. 1974 Supp. 75-3701 *et seq.*) and thereafter to have it approved by an attorney of that department. Nowhere in this procedure is approval by the Board of Regents found. If the Board of Regents desires to establish guidelines in contractual matters for state educational institutions it may do so. However, absent any such rules or regulations, Wichita State cannot use the statute to deny the validity of the Aviation Services Agreement following execution and partial performance. Common honesty forbids repudiation now. (*Municipal Power Transmission Co. v. City of Lyndon,* 127 Kan. 59, 272 Pac. 158.)

We make one final observation on these points. As indicated, Wichita State has contended in this appeal that Mr. Katzenmeyer did not have the authority to bind the University, but only authority to contractually obligate PEC. It maintains the Aviation Services Agreement is between Golden Eagle and PEC. It also contends absent the statutorily required approval of the Board of Regents, the contract is void and unenforceable.

Broad authority is granted the Board of Regents in its control, operation and management of this state's universities and colleges. See *Murray v. State Board of Regents,* 194 Kan. 686, 401 P. 2d 898; K. S. A. 1974 Supp. 76-712. Likewise, the chief executive officer of each university or college is given broad administrative authority with respect to the affairs of his institution, and extensive power is granted to delegate any part of his authority or any of his duties. (K. S. A. 1974 Supp. 76-725.)

Today, the use of separate corporate entities in collegiate athletics appears to be common, perhaps widespread, but indeed shadowy as to involvement and responsibility. Whether such arrangements should continue is not a question for this court. But when the in-

volvement is such as presented in the instant case, then it begs logic to hold no agency relations exist, and that the principles thereof do not apply. Performance under the contract had begun and payments made; this constituted tacit, effective approval of the aviation agreement contract. See *Taylor v. Fee,* 233 F. 2d 251, 258 (7th Cir. 1956).

The sympathy extended to those who felt the impact of this tragedy is now but a memory. The appellants now stand before this court seeking the right to redress their injuries by due course of law. They have found in their quest that such right is barred by K. S. A. 46-901. Alone, they now assail the validity of that barrier, and present to this court multiple challenges as to its constitutionality. We now resolve those challenges and in so doing hold the doctrine of governmental immunity codified in K. S. A. 46-901 to be constitutionally impermissible.

The historical origin of the governmental immunity doctrine is found in the English case of *Russell v. Men of Devon,* 2 T. R. 667, 100 Eng. Rep. 359 (1788). From that decision there evolved three distinct common-law doctrines, two favoring public entities and the other favoring public officials. The doctrines of governmental and sovereign immunity were held to exempt governmental entities from privately instituted civil suits without the express consent of the sovereign. Those doctrines were founded upon the beliefs the courts, which derived their power from the sovereign, could not have been empowered to enforce such authority against the sovereign or extensions thereof; that the king could do no tortious wrong, nor could he authorize such conduct while acting in his sovereign capacity, for no man can do by his agents and officers that which he cannot do by himself. In denying vicarious liability for torts, those doctrines represented a significant departure from the common-law doctrine of *respondeat superior.* (Borchard, Government Liability in Tort, 34 Yale L. J. 1 [1924-25]; Borchard, Government Responsibility in Tort, 36 Yale L. J. 1039 [1927]; Jaffe, Suits Against Governments and Officers; Damage Actions, 77 Harv. L. Rev. 209 [1963].) Under the doctrine of immunity for governmental officers, the common law recognized the necessity of permitting public officials to perform their official duties free from the threat of personal liability. (*Kretchmar v. City of Atchison,* 133 Kan. 198, 299 Pac. 621; *Gresty v. Darby,* 146 Kan. 63, 68 P. 2d 649; *Cunningham v. Blythe,* 155 Kan. 689, 127 P. 2d 489.)

Although early decisions of this court, *City of Topeka v. Tuttle,*

5 Kan. 186 [* 311]; *City of Atchison v. King,* 9 Kan. 550; *City of Atchison v. Challiss,* 9 Kan. 603; *City of Ottawa v. Washabaugh,* 11 Kan. 102 [* 124]; *City of Wyandotte v. White,* 13 Kan. 146 [* 191], were related to the liability of government, we first recognized the immunity doctrine in *Eikenberry v. Township of Bazaar,* 22 Kan. 389 [* 556]. The principal question presented in *Eikenberry* was whether a township was liable for injuries caused by an unsafe or defective highway. Finding the township to be a quasi corporation existing only for the purposes of the general political government of the state, we held the township immune from suit. Chief Justice Horton wrote the opinion for the court, and said:

". . . [A]ll the powers with which [the townships] are intrusted are the powers of the state, and all the duties with which they are charged are the duties of the state; that in the performance of governmental duties, the sovereign power is not amenable to individuals, and therefore these organizations are not liable at the common law for such neglect, and can only be made liable by statute. . . ." (l. c. 391, * 561.) .

As originally applied, the doctrine conferred absolute immunity upon the state and its extensions except in cases where consent had been given. Thereafter, to temper the harshness of the immunity doctrine, we began to restrict or withdraw its application in certain areas, and in so doing, created exceptions to the immunity concept. We held municipalities of this state immune in the performance of governmental functions, but liable for tortious actions resulting from functions proprietary in nature. (*Hinze v. City of Iola,* 92 Kan. 779, 142 Pac. 947; *Water Co. v. City of Wichita,* 98 Kan. 256, 158 Pac. 49; *Krantz v. City of Hutchinson, et al.,* 165 Kan. 449, 196 P. 2d 227, 5 A. L. R. 2d 47; *Wendler v. City of Great Bend,* 181 Kan. 753, 316 P. 2d 265; *Grover v. City of Manhattan,* 198 Kan. 307, 424 P. 2d 256.) Municipalities also were held liable for the creation and maintenance of a nuisance (*Steifer v. City of Kansas City,* 175 Kan. 794, 267 P. 2d 474; *Lehmkuhl v. City of Junction City,* 179 Kan. 389, 295 P. 2d 621, 56 A. L. R. 2d 1409; *Galleher v. City of Wichita,* 179 Kan. 513, 296 P. 2d 1062; *Adams v. Arkansas City,* 188 Kan. 391, 362 P. 2d 829) and liable for failing to keep streets reasonably safe for public purposes. (*City of Ottawa v. Washabaugh,* supra; *City of Wyandotte v. White,* supra; *Loftin v. City of Kansas City,* 164 Kan. 412, 190 P. 2d 378; *Smith v. City of Emporia,* 169 Kan. 359, 219 P. 2d 451; *Perry v. City of Wichita,* 174 Kan. 264, 255 P. 2d 667; *Grantham v. City of Topeka,* 196 Kan. 393, 411 P. 2d 634.)

Our holding in *Carroll v. Kittle,* 203 Kan. 841, 457 P. 2d 21, is the

high-water mark of our decisions restricting the application of the immunity doctrine in Kansas. There, the plaintiff, an oil field worker, had caught his arm in a drilling rig. He was rushed to the University of Kansas Medical Center where his partially severed left arm was reattached by a team of doctors. Eight days after the surgery, the plaintiff, while in a disoriented state, ripped off the heavy bandages and splints from the injured arm. His arm was rewrapped by the night resident surgeon and the incident was recorded on his hospital chart. In the early morning hours on the tenth day of his recovery, the plaintiff was discovered with the bandages ripped completely off, tearing at his injured arm. The damage done on the second occasion was so extensive the arm had to be amputated.

Plaintiff was a private patient at the medical center and paid all charges for his hospitalization. He filed suit alleging the self-inflicted injury and resulting loss of his left arm was directly and proximately caused by the negligence and carelessness of the defendant Kittle, the members of the Board of Regents of the state of Kansas, and their agents, servants and employees. Kittle, plaintiff's doctor, was a staff physician who also conducted a private medical practice at the medical center. The only issue presented on appeal was whether the doctrine of sovereign immunity was applicable.

In the opinion this court departed from the term "sovereign immunity" and merged that concept into the applicable term "governmental immunity." Moreover, we acknowledged the inequality of the immunity doctrine as it had been applied. We held the responsibility of the various governmental agencies should be equalized by the elimination of all governmental immunity from negligence when the state or its agencies are engaged in a private or proprietary function.

In *Carroll* we recognized again the Legislature had authority in the field of governmental immunity. But such recognition cannot validate that which contravenes the federal and Kansas Constitutions. There, we said:

". . . [I]n abolishing governmental immunity to the extent suggested, we want it clearly understood that we recognize the authority of the legislature to control the entire field including that part covered by this opinion. *We would suggest that the legislature is in a much better position than this court to restrict the application of the doctrine because it can supplement the restriction with proper legislation* in the form of provisions for insurance, etc. . . ." (l. c. 848.) (Emphasis supplied.)

The legislative response to this court's invitation to restrict the immunity doctrine is found in part in K. S. A. 46-901, 902. The statutes provide:

"46-901. Governmental immunity of state; implied contract, negligence or other tort; notice in state contracts. (a) It is hereby declared and provided that the following shall be immune from liability and suit on an implied contract, or for negligence or any other tort, except as is otherwise specifically provided by statute:

"(1) The state of Kansas; and

"(2) boards, commissions, departments, agencies, bureaus and institutions of the state of Kansas; and

"(3) all committees, assemblies, groups, by whatever designation, authorized by constitution or statute to act on behalf of or for the state of Kansas.

"(b) The immunities established by this section shall apply to all the members of the classes described, whether the same are in existence on the effective date of this act or become members of any such class after the effective date of this act.

"(c) The state of Kansas and all boards, commissions, departments, agencies, bureaus and institutions and all committees, assemblies and groups declared to be immune from liability and suit under the provisions of subsection (a) of this section shall, in all express contracts, written or oral, with members of the public, give notice of such immunity from liability and suit. [L. 1970, ch. 200, § 1; March 26.]

"46-902. Nonapplication to local units of government. (a) Nothing in section 1 [46-901] of this act shall apply to or change the liabilities of local units of government including (but not limited to) counties, cities, school districts, community junior colleges, library districts, hospital districts, cemetery districts, fire districts, townships, water districts, irrigation districts, drainage districts and sewer districts, and boards, commissions, committees, authorities, departments and agencies of local units of government.

"(b) The provisions of section 1 [46-901] of this act shall not create any liability not now existent according to law, nor effect, change or diminish any procedural requirement necessary for recovery from any local unit of government. [L. 1970, ch. 200, § 2; March 26.]"

By the above enactments, the law of governmental immunity in Kansas reverted back to its status prior to our decision in *Carroll.* Subsequent decisions of this court (*Woods v. Kansas Turnpike Authority*, 205 Kan. 770, 472 P. 2d 219; *Daniels v. Kansas Highway Patrol*, 206 Kan. 710, 482 P. 2d 46; *Allen v. City of Ogden*, 210 Kan. 136, 499 P. 2d 527) have been in accord with the immunity doctrine as codified, the exceptions thereto under the common law, and the several legislative inroads. (K. S. A. 68-301; K. S. A. 68-419; K. S. A. 68-2015; K. S. A. 1974 Supp. 12-2601-2614; K. S. A. 72-8404-8415 as amended K. S. A. 1974 Supp. 72-8416, 8417; K. S. A. 74-4707-4713.) For example, in *Woods v. Kansas Turnpike Authority*,

supra, we were confronted with the question whether the Turnpike Authority was immune from liability for personal injuries resulting from the creation or maintenance of a nuisance. In sustaining that immunity, we said:

". . . We . . . decline to engraft solely for plaintiff's benefit the nuisance exception to the immunity previously accorded the Kansas turnpike authority under our law as it existed prior to Carroll." (l. c. 774.) (Emphasis supplied.)

Prior to our decision in *Carroll* the common-law immunity concept was attacked from time to time as violating constitutional guarantees. (*McCoy v. Board of Regents*, 196 Kan. 506, 413 P. 2d 73; *Caywood v. Board of County Commissioners*, 194 Kan. 419, 399 P. 2d 561.) In *Carroll* we judicially altered the immunity doctrine so that it applied uniformly to all units of government, and thereby nullified prior decisions holding that immunity, as a court-made rule, was permissible as an exception which did not violate constitutional concepts.

We are not called upon in the instant case to except again from the immunity doctrine as in *Woods*, nor can we now consider judicially terminating the doctrine as in *Carroll*. Here, we are presented with multiple challenges to the constitutionality of the doctrine of governmental immunity as set forth in K. S. A. 46-901, 902.

Neither the United States Constitution nor the Kansas Constitution confer immunity upon this state. (*Cohens v. Virginia*, 19 U. S. 120 [* 264], 5 L. Ed. 257; *Carroll v. Kittle*, supra.) Both Constitutions are paramount law within their separate spheres. (*Atkinson v. Woodmansee*, 68 Kan. 71, 74 Pac. 640, 64 L. R. A. 325; *Ex Parte Young*, 209 U. S. 123, 52 L. Ed. 714, 28 S. Ct. 441.) As the guardian of the principles embodied in the Constitutions, it is within our inherent power, and our duty, to determine the constitutionality of the legislation in question. (*Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 408 P. 2d 877.) With this background, we turn to the arguments presented.

The appellants contend K. S. A. 46-901 denies them equal protection of the law. The equal protection clause of the Fourteenth Amendment to the United States Constitution finds its counterpart in Sections 1 and 2 of the Bill of Rights of the Kansas Constitution. Sections 1 and 2 declare that "all men are possessed of equal and inalienable natural rights, among which are life, liberty and the pursuit of happiness," and that "all free governments . . . are instituted for their equal protection and benefit." (*Manzanares v.*

*Bell,* 214 Kan. 589, 522 P. 2d 1291; *Henry v. Bauder,* 213 Kan. 751, 518 P. 2d 362.) Neither the equal protection clause of the Fourteenth Amendment nor Sections 1 and 2 of the Kansas Bill of Rights deny the Legislature the power to create distinct classifications of persons in different ways. Any distinction inherent in a particular classification must have a proper and reasonable basis for such classification. (*Pinkerton v. Schwiethale,* 208 Kan. 596, 493 P. 2d 200.)

Presently the state and all of its agencies have absolute immunity "from liability and suit, on an implied contract, or for negligence or any other tort, except as is otherwise specifically provided by statute." (K. S. A. 46-901.) A county, an auxiliary agency of the state, is immune from liability unless such liability is expressly imposed by statute, or necessarily implied therefrom. (*Caywood v. Board of County Commissioners,* supra; K. S. A. 46-902.) A city is liable for tortious conduct when engaged in proprietary activities, but enjoys immunity while engaged in governmental activities except for the creation and maintenance of a nuisance and the failure to keep streets reasonably safe. (*Grantham v. City of Topeka,* supra; *Grover v. City of Manhattan,* 198 Kan. 307, 424 P. 2d 256; K. S. A. 46-902.)

Under the foregoing, persons injured by a governmental entity are classified, solely by the type of the governmental entity involved. Their right to redress and the remedies available, if any, to them are dependent solely upon this classification. Prior to the enactment of K. S. A. 46-901, 902, we expressed our concern as to the reasonableness of so classifying persons injured by governmental units or agencies. In *Wendler v. City of Great Bend,* supra, Mr. Justice Schroeder expressed this court's concern as follows:

"The State is usually deemed immune regardless of the kind of function it is performing. What justifies the difference between the State and its municipal subdivisions is baffling. The decisions seem to result from accident rather than from reason, and tend to make one question the entire rationale of the principle. For example: Consider the liability of a city to a pedestrian injured by the negligence of a city employee operating a pick-up truck under the supervision of the Water Department, and the nonliability of a city on the same facts where the truck is under the supervision of the Fire Department." (l. c. 759.)

In *Carroll* we again emphasized our concern as to this irrational classification and sought to equalize responsibility. In the opinion it was said:

". . . It is difficult for the majority of the court to see why one governmental agency performing precisely the same acts—*e. g.,* operating a hospital for profit—should be liable for negligence and others should not." (1. c. 847.)

Wichita State vigorously contends that practical and important distinctions exist for the classifications made by K. S. A. 46-901, 902. We can find none. A person's right to redress by due course of law does not become less worthy of protection because he or she was injured by a particular governmental unit. Nor does such person's right to compensation become any the less worthy because of the type of a governmental unit involved. Under present Kansas law, no regard is given to the injury or the facts and circumstances surrounding the events which caused the injury—it is the type of governmental agency and the activity in which it is engaged that determines whether the aggrieved party will find the doors of the court open or closed. Such a classification is forced and unreal, and greater burdens are imposed on some than others of the same desert. We find the classifications contained in K. S. A. 46-901, 902 are not only "baffling," but arbitrary, discriminatory and unreasonable.

The doctrine of governmental immunity is an historical anachronism which manifests an inefficient public policy and works injustice upon everyone concerned. The doctrine and the exceptions thereto operate in such an illogical manner as to result in serious inequality. Liability is the rule for negligent or tortious conduct, immunity is the exception. But when the tortfeasor is a governmental agency immunized from liability, the injured person must forego his right to redress unless within a specific exception. Equality is not achieved by artificial exceptions which indiscriminately grant some injured persons recourse in the courts and arbitrarily deny such relief to others. (*Winters v. Myers,* 92 Kan. 414, 140 Pac. 1033.) The operative effect of such arbitrary distinctions is incompatible with the constitutional safeguards established by both the federal and Kansas Constitutions. Accordingly, we hold K. S. A. 46-901, 902 are unconstitutional and void as a denial of equal protection of the law under the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Bill of Rights.

Appellants next contend K. S. A. 46-901, 902 deny them due process of law under the Fourteenth Amendment to the United States Constitution and violate Section 18 of the Kansas Bill of Rights. We shall consider first the due process contention.

The political truths contained in Sections 1 and 2 of the Kansas Bill of Rights, previously quoted, have been held by this court to have the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law. (*Tri-State Hotel Co. v. Londerholm,* supra; *Henry v. Bauder,* supra.)

A fundamental aspect of our cohesive society is its system of laws defining the rights and duties of its members. By virtue of such a system, our citizens are able to govern their individual affairs in an orderly manner, and definitively settle their differences. The concept of due process of law is a strategic and central necessity in our system of jurisprudence. It is this concept, embodied in both the federal and Kansas Constitutions, that guarantees one will not arbitrarily be deprived of his rights, liberty or property.

To say the governmental immunity statutes in question subvert the concept of due process is but to state the obvious, for that doctrine blocks access to our courts to those seeking redress for injuries occasioned by the negligent act of a governmental entity. In the instant case, the appellants have been summarily excluded from our courts—the only forum empowered by the people to redress their grievances by due process of law. In this posture, we must determine whether the legislation before this court bears a reasonable relation to a permissible legislative objective. (*Manzanares v. Bell,* supra; *City of Colby v. Hurtt,* 212 Kan. 113, 509 P. 2d 1142.)

The rationale upon which the theory of governmental immunity rests has been the subject of much debate. The doctrine, born of expediency, represents an expression of the Eighteenth Century philosophy that "it is better that an individual should sustain an injury than the public shall suffer an inconvenience." (*Russell v. Men of Devon, op. cit.,* supra.) In an historical perspective, the doctrine is said to rest upon forestalling "an infinity of actions" and the reluctance of the court to divert public funds "out of which satisfaction is to be made" for private injury. (*Russell v. Men of Devon, op. cit.,* supra.)

We considered those objectives in *Carroll,* and said:

"We do not subscribe to the theory that sovereign immunity in the United States, and in the individual states, is traceable to the medieval concept that 'the king can do no wrong.' Our forefathers did not fight the Revolutionary War because they were of that opinion. Their reasoning was quite the contrary. It is difficult for us to believe that they would carry over into their common law a principle so opposed to their basic belief. (See *Wendler v. City of Great Bend,* 181 Kan. 753, 316 P. 2d 265.)

"No doubt the absolute monarchs of the past, and the dictators of today,

refused and still refuse to be charged with wrong, but that is no reason why our representative and democratic forms of government should be so classified. We think the rule was adopted in this country as a convenience to a sovereign people. Under our form of government the legal sovereignty is in the people, and the people, in the exercise of their governmental power, through the states, did not wish to be sued and harassed in carrying out their governmental functions. . . ." (l. c. 846.)

We do not subscribe to the belief that convenience is a pervasive legislative objective sufficient to totally deprive the appellants access to the courts. Convenience is completely unacceptable as a standard by which to balance the rights of an individual against the interest of the state. Convenience should not outweigh an individual's right to be compensated for actual damages sustained and injuries suffered. (*Muskopf v. Corning Hospital Dist.*, 55 C. 2d 211, 11 Cal. Rptr. 89, 359 P. 2d 457.) To hold convenience is a permissible legislative objective, sufficient to insulate the government from negligence, is to engage in incredulous reasoning, void of logic, which undermines the very principles upon which this nation was founded.

Nor do we find the threat of multiple lawsuits a tenable basis by which the appellants can be denied access to the courts of this state. The threat of "an infinity of actions" is but a monument of shallow reasoning utilized to thwart necessary changes in the law. No individual can match the state's vast resources. Undoubtedly there will be those who shall seek unnecessarily to avail themselves of the access we now provide. That problem, however, can be resolved either by the demands of the law—demands which must be fulfilled before recovery can be secured—or by enactment by the Legislature of an adequate Tort Claims Act. We find it impermissible to deny appellants access to the courts as a means of forestalling spurious actions.

In reality, it is most probably the last rationale, that of diverting public funds to compensate for private injury, which has kept the doors of the courts closed for so long. The error of this rationale lies in the speculation from which it is borne. We have in the past alleviated this fear by permitting limited exceptions to the doctrine of governmental immunity. Moreover, where the act complained of was within a specific exception, the requirements of the law eliminated any such fear. It is the law and its requirements, which must, and will, insure the public monies are not diverted unnecessarily. (See *Martin v. State Highway Commission*, 213 Kan. 877, 518 P. 2d 437.)

In an article by Lawrence E. Blades, 16 Kan. L. Rev. 265, entitled "A Comment on Governmental Tort Immunity in Kansas" appears the following:

". . . The fear that the removal of immunity would lead inevitably to financial embarrassment and thus the disruption of government has often been expressed. But this fear is more fanciful than real. The Federal government and a number of states have adopted and operated under more or less comprehensive rules of governmental responsibility in tort without any meaningful symptom of resultant or impending financial ruin. So, too, have a number of foreign countries. . . ." (p. 268.)

Note, Governmental Tort Immunity in Kansas, 10 Washburn L. J. 59; Comment, Governmental Immunity in Kansas: Prospects for Enlightened Change, 19 Kan. L. Rev. 211; Van Alstyne, Governmental Tort Liability: A Decade of Change, 1966 U. Ill. L. F. 919.

The elasticity of the due process concept has occasioned much debate, and "controversies have raged about the cryptic and abstract words" of that guarantee. (*Mullane v. Central Hanover Tr. Co.*, 339 U. S. 306, 313, 94 L. Ed. 865, 70 S. Ct. 652.) But if due process is to be secured, the law must operate alike upon all and not subject the few to the arbitrary exercise of governmental power. Every citizen of this state has a right to be protected by the government in the enjoyment of his life, liberty and property. To that end elaborate safeguards are to be found in the law. The life and liberty the state may not take directly, it cannot take indirectly, for a "grant of power by the public is never to be interpreted as a privilege to injure." (*Drainage District v. Railway Co.*, 99 Kan. 188, 161 Pac. 937.)

In sum, we find K. S. A. 46-901, 902 do not bear a reasonable relation to a permissible legislative objective. We hold those statutes transgress upon the guarantee of due process of law as provided in the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Bill of Rights.

We now consider the argument regarding Section 18 of the Kansas Bill of Rights. That section provides:

"All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

In *Noel v. Menninger Foundation*, 175 Kan. 751, 267 P. 2d 934, this court held the common-law doctrine of charitable immunity was constitutionally impermissible. The oft-quoted words of Mr. Justice Wertz as to the rights guaranteed by Section 18, and stated in *Noel* follow:

". . . The constitutional provision guaranteeing to every person a remedy by due course of law for injury done him in person or property means that for such wrongs that are recognized by the law of the land the court shall be open and afford a remedy, or that laws shall be enacted giving a certain remedy for all injuries or wrongs. 'Remedy by due course of law,' so used, means the reparation for injury ordered by a tribunal having jurisdiction in due course of procedure after a fair hearing. It is the primary duty of the courts to safeguard the declaration of right and remedy guaranteed by the constitutional provision insuring a remedy for all injuries. . . ." (1. c. 763.)

Moreover, in *Noel* we used language appropriate to this case:

"To exempt charitable and nonprofit corporations from liability for their torts is plainly contrary to our constitutional guaranties (Bill of Rights, § 18). It gives to certain favored ones, selected arbitrarily, immunity from that equal liability for civil wrongs which is a sign of equality between citizens. It undertakes to clothe charitable and nonprofit organizations with special privileges denied to other corporations, and society. It takes from individuals the right to assert in the courts claims against all who tortiously assail their person and property and to recover judgment for injuries done. It prevents all persons from having recourse to law for vindication of rights or reparation for wrongs against the privileged charitable, nonprofit organizations. It frees one set of corporations from obligations to which their competitors and individuals, are subjected. In short, it destroys equality and creates special privilege. [Citation]." (1. c. 763.)

We reach the same conclusion with respect to governmental immunity. As observed, the immunity statute creates a class which this court has said to be without a rational basis. Here, as in the case of charitable immunity, certain favored governmental units are selected arbitrarily to be immune from civil wrongs. (*Wendler v. City of Great Bend,* supra; *Carroll v. Kittle,* supra.)

K. S. A. 46-901, 902 take from the individual the right to assert in a court of law claims against state governmental units which by tortious conduct have injured his person. They prevent *all* persons having a claim against such agencies from having recourse at law for vindication of rights or reparation for the wrongs. Those statutes, like the common-law doctrine, deprive the injured party from bringing an action to remedy the injury unless insurance has been purchased and the state's immunity specifically waived. See, K. S. A. 74-4701-4716; *Mott, Executor v. Mitchell,* 209 Kan. 476, 496 P. 2d 1297; *Allen v. City of Ogden,* supra, pp. 138, 139.

In the instant case, had the prescribed insurance been purchased as required by the contract and pertinent federal law and regulations we would not be called upon to resolve the constitutional challenge presented. Notwithstanding this fact, the appellee con-

tends it is not liable under the immunity doctrine. Governmental immunity was not established to condone the deliberate failure of governmental bodies to comply with the law. In sum, the doctrine of governmental immunity destroys equality and creates special privileges.

We also note another similarity between the *Noel* case and the instant case. In the aftermath of *Noel*, the Legislature enacted a statute (K. S. A. 1959 Supp. 17-1725) which rendered the property of a class of corporations (including hospitals operated on a nonprofit basis) immune from process. The effect of that statute was to reinstate the immunity doctrine as to the negligent acts of some charitable institutions. In *Neely v. St. Francis Hospital & School of Nursing*, 192 Kan. 716, 391 P. 2d 155, that statute was challenged, and the sole issue was whether it violated Section 18. Our decision in *Neely* indicates the importance this court attached to the duty articulated in *Noel*. In holding the statute unconstitutional, this court re-emphasized the importance of the rights and remedies guaranteed all by Section 18, and said:

"Despite the clarity of the admonition contained in the foregoing [*Noel*] opinion, with reference to the constitutional guaranties protecting *remedies* for injury to person, reputation or property, the legislature, no doubt at the request of certain corporations organized not for profit and which operate or support one or more hospitals, operated on a nonprofit basis, adopted 17-1725, *supra*." (l. c. 720.)

In both instances the doctrines (*i. e.*, charitable immunity in *Noel* and governmental immunity in the case at bar) were judicially created to avoid liability for tort. Both immunities were overturned by this court (charitable immunity in *Noel* and governmental immunity in *Carroll*) and were both reimposed by the Legislature. We emphasize that in *Neely* this court refused to allow the Legislature to accomplish an unconstitutional result in view of our prior ruling on the subject. *The same result necessarily follows in the case at bar.* Notwithstanding the Legislature's response to our invitation in *Carroll* to delineate governmental liability for its tortious acts, we are not restrained in putting the legislative response to a constitutional test. Nor does our conclusion in *Woods* that sound policy precludes further judicial inroads into the Legislature's comprehensive statement on governmental immunity bind this court since the statute's constitutional validity was not there in issue. See *State v. Hill*, 189 Kan. 403, 409, 410, 369 P. 2d 365, 91 A. L. R. 2d 750.

Finally,. in *Sanders v. State Highway Commission*, 211 Kan. 776, 508 P. 2d 981, we were confronted with a claim of immunity by the highway commission in an inverse condemnation action. Historically, inverse condemnation actions have been categorized by this court to be based upon an implied contract. Thus, according to the highway commission, inverse condemnation actions were within the scope of K. S. A. 46-901 unless "otherwise specifically provided by statute." We responded to this argument as follows:

"If the provisions of K. S. A. 1972 Supp. 46-901 *et seq.* [K. S. A. 46-901] were intended by the legislature to place the cloak of governmental immunity around suits in the nature of inverse condemnation it becomes the duty of this court to safeguard the declaration of the right and the remedy guaranteed by the constitution and we must then declare the statute unconstitutional. (*Noel v. Menninger Foundation*, 175 Kan. 751, 267 P. 2d 934; *Neely v. St. Francis Hospital & School of Nursing*, 192 Kan. 716, 391 P. 2d 155.)" (1. c. 787.)

Section 18 protects persons as well as property. Had the court been required in *Sanders* to enforce the guarantees of Section 18 as it relates to property, it is evident we would not have hesitated to do so. Are the rights of an individual worthy of less protection? We think they are not.

All powers of our government are derived from the people. Their source, indeed their reservoir of strength, is in the people. For this court to now hold that governmental immunity as declared in K. S. A. 46-901, 902 does not contravene Section 18 as applied to the rights of individuals would be tantamount to construing that section as affording greater protection to property than to an individual. In so doing, we would imbed in our present law the evaluation of the individual and his property which prevailed in the early development of the common law. This would be unwise, for, as we said in *Steele v. Latimer*, 214 Kan. 329, 332, 521 P. 2d 304, "the principle of change runs deeply through human history and like a golden thread weaves new 'people requirements' into the fabrics of altered social patterns." We hold K. S. A. 46-901, 902 violate the guarantees declared in Section 18 of the Bill of Rights of the Constitution of the state of Kansas.

Having declared the doctrine of governmental immunity as codified in K. S. A. 46-901, 902 to be constitutionally void, equality returns in regard to the responsibility of all levels of government in this state when engaged in proprietary activities. However, by equalizing responsibility we are confronted with the final question

presented in this appeal. Is the transporting of football players, university personnel and interested alumni to a scheduled intercollegiate away football game a governmental or proprietary function?

On this point, the arguments of the parties are quite simple. Appellants contend the transporting of athletes and other personnel is a proprietary function; Wichita State contends it is a governmental function. According to Wichita State, the colleges and universities of this state are created exclusively for the purpose of providing educational facilities in which the state system of higher public education is administered. Hence, it maintains that all authorized functions of the state universities are governmental in character.

While we agree with the suggestion regarding the purpose of this state's colleges and universities, we find the syllogism proffered by the University to be an overly broad, generalized conclusion.

The governmental and proprietary distinction is one of classic limitation of the common law to restrict the doctrine of governmental immunity. As initially applied by this court, the governmental-proprietary distinction related only to municipalities. (*State v. Water Co.*, 61 Kan. 547, 60 Pac. 337; *Freeman v. Chanute*, 63 Kan. 573, 66 Pac. 647; *Hinze v. City of Iola*, 92 Kan. 779, 142 Pac. 947; *City of Wichita v. Railroad & Light Co.*, 96 Kan. 606, 152 Pac. 768; *McCormick v. Kansas City*, 127 Kan. 255, 273 Pac. 471; *McGinley v. City of Cherryvale*, 141 Kan. 155, 40 P. 2d 377; *Snook v. City of Winfield*, 144 Kan. 375, 61 P. 2d 101.) The basis permitting this distinction was the proposition that municipalities exist and function in a dual capacity—one being governmental, and the other proprietary. (*Water Co. v. City of Wichita*, 98 Kan. 256, 158. Pac. 49; *Rose v. City of Gypsum*, 104 Kan. 412, 179 Pac. 348.)

In *Carroll* we reversed our holding in *McCoy v. Board of Regents*, 196 Kan. 506, 413 P. 2d 73, that the proprietary function exception to the immunity doctrine was not applicable to either counties or the state. We held in *Carroll* that all levels of government have the same responsibility for torts when engaged in private or proprietary functions.

Today, the task of classifying a particular activity as either proprietary or governmental is far more difficult than it was when the distinction was first applied. As the reach of government has ex-

panded, it has become more and more difficult to ascertain whether an activity admits to being a proprietary function. In *Krantz v. City of Hutchinson, et al.,* 165 Kan. 449, 196 P. 2d 227, 5 A. L. R. 2d 47, we reviewed several definitions of proprietary functions. In that case we held governmental functions are performed for the general public, with respect to the common welfare and for the exercise of which it receives no compensation or particular benefit, while proprietary functions are exercised for some specific benefit or advantage to the corporation or those comprising the local urban community.

In *Grover v. City of Manhattan,* 198 Kan. 307, 424 P. 2d 256, we held the applicable test to be as follows:

"In determining whether activities of a municipality are governmental or proprietary, it is proper to consider whether the activity is primarily for the advantage of the *state as a whole* or for the *special local benefit* of the community involved, and to further consider whether the activity is in performance of a *duty imposed upon* the municipality by the sovereign power, or is in the exercise of a *permissive privilege* granted by the sovereign power; *but such tests are not conclusive* in determining the capacity in which the city's activities are conducted. (Citation.)" (Syl. ¶ 1.)

Thereafter, in *Carroll* we held a governmental agency is engaged in a proprietary activity when it embarks on an enterprise which is commercial in character *or* is usually carried on by private individuals *or* is for the profit, benefit or advantage of the governmental unit conducting the activity. (Syl. ¶ 7.)

The above tests clearly illustrate the problem inherent in the governmental-proprietary distinction—that of defining a proprietary function. The cases attempting to resolve this problem are legion, and are replete with conflicts and inconsistencies. Moreover, when an activity partakes of both governmental and proprietary characteristics, the problem of categorizing that activity becomes even more uncertain. The end result of such conflicts and uncertainties is that "shadowy distinctions between governmental functions and proprietary affairs . . . have been used to decide cases, all without much rhyme or reason. . . ." (*Wendler v. City of Great Bend,* 181 Kan. 753, 758, 316 P. 2d 265.)

Nevertheless, we believe the governmental-proprietary distinction still has vitality. Implicit in the distinction is the recognition that it "is not a tort for government to govern." (Jackson, J., dissenting in *Dalehite v. United States,* 346 U. S. 15, 57, 97 L. Ed. 1427, 73 S. Ct. 956.) Depending upon the facts and circumstances involved,

the distinction can serve either to place government in the shoes of the private tortfeasor, or to limit government liability. For example, under the distinction the state is not exposed to liability as to legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial cast. Nor is the state liable in matters involving the exercise of official judgment or discretion. (*Willis, et al. v. Dept. of Cons. & Ec. Dev.,* 55 N. J. 534, 264 A. 2d 34. See *Wood v. Strickland,* 420 U. S. 308, 43 L. Ed. 2d 214, 95 S. Ct. 992 [1975].)

We believe the problem in applying the governmental-proprietary distinction lies in attempting to set forth a precise definition of the terms. We have previously stated that no single test is determinative of whether a particular function is governmental or proprietary. (*Grover v. City of Manhattan,* supra.) In view of the expanding reach of government today, it is time the liability exposure of governmental units be determined in conjunction with the total facts and circumstances involved. Such a determination will have to be made on a case by case basis. We do not attempt in this opinion to express an ultimate doctrine. The law will be better served by evolving controlling principles out of the realities of specific cases. In this regard we note the judicial decisions abrogating the doctrine of governmental immunity reflect varying approaches as to when liability attaches. (See, e. g., *Scheele v. City of Anchorage,* 385 P. 2d 582 [Alaska 1963]; *Stone v. Arizona Highway Commission,* 93 Ariz. 384, 381 P. 2d 107; *Parish v. Pitts,* 244 Ark. 1239, 429 S. W. 2d 45; *Muskopf v. Corning Hospital Dist.,* supra; *Flournoy v. Sch. Dist. 1,* 174 Colo. 110, 482 P. 2d 966; *Hargrove v. Town of Cocoa Beach,* 96 So. 2d 130, 60 A. L. R. 2d 1193 [Fla. 1957]; *Smith v. State,* 93 Idaho 795, 473 P. 2d 937; *Molitor v. Kaneland Com. Unit Dist.,* 18 Ill. 2d 11, 163 N. E. 2d 89; *Campbell; Knotts v. State,* 259 Ind. 55, 284 N. E. 2d 733 [1972]; *Klepinger v. Bd. of Comm. Co. of Miami,* 143 Ind. App. 155, 239 N. E. 2d 160; *Haney v. City of Lexington,* 386 S. W. 2d 738 [Ky. 1964]; *Sherbutte v. Marine City,* 374 Mich. 48, 130 N. W. 2d 920; *Williams v. City of Detroit,* 364 Mich. 231, 111 N. W. 2d 1; *Spanel v. Mounds View School Dist. No. 621,* 264 Minn. 279, 118 N. W. 2d 795; *Johnson v. Municipal University of Omaha,* 184 Neb. 512, 169 N. W. 2d 286; *Brown v. City of Omaha,* 183 Neb. 430, 160 N. W. 2d 805; *Rice v. Clark County,* 79 Nev. 253, 382 P. 2d 605; *Willis, et al. v. Dept. of Cons. & Ec. Dev.,* supra; *Ayala et al. v. Phila. Bd. of Pub. Educ.,* 453 Pa. 584, 305 A. 2d 877 [1973]; *Becker v. Beaudoin,* 106 R. I. 562, 261 A. 2d 896; *Holytz v.*

*Milwaukee*, 17 Wis. 2d 26, 115 N. W. 2d 618.) However, in the absence of legislation addressed to the immunity problem in the form of an appropriate Tort Claims Act, liability for tortious conduct of a governmental entity in Kansas will depend upon the particular activity with due consideration given to the totality of all relevant factors.

In the case at bar, we are confronted with a state university which, in the furtherance of its intercollegiate athletic program, undertook to transport its team members, school faculty and interested alumni to an away football game. We are not concerned with the operation and maintenance of a public school. (*Rose v. Board of Education*, 184 Kan. 486, 337 P. 2d 652.) Nor do the facts of this case concern the furnishing of transportation for children to and from a public school. (Anno: Schools-Torts-Sovereign Immunity, 33 A. L. R. 3d 703; see, also, K. S. A. 72-8301 *et seq.*; 72-8401 *et seq.*; K. S. A. 1974 Supp. 72-8416, 8417.)

As indicated, the district court sustained the appellee's motion for summary judgment, and all the facts pertaining to this litigation have not been fully presented. We can through judicial notice take cognizance of certain aspects of this case. Through judicial notice, judges may properly take and act upon certain facts without proof because they already know them. (K. S. A. 60-409.)

It is common knowledge that intercollegiate football is "big business" and is operated in a businesslike manner; that it is not only an athletic endeavor of the participating universities, but also entertainment for the school's students, faculty, alumni, as well as the general public. Intercollegiate football is a commercial activity. The benefits and advantages derived from that activity inure to the university, the governmental entity conducting the activity. Here, it was Wichita State University that secured the transportation which occasioned this tragedy, not the alumni, the faculty, or for that matter, the student players. It may not be said that intercollegiate football is in any respect a governmental function—to contend otherwise is to disregard the obvious. Intercollegiate football as presently carried on is a proprietary function. It follows that transporting players and others to a scheduled away intercollegiate football game is likewise a proprietary function of the University. Accordingly, we hold the district court erred in sustaining Wichita State's motion for summary judgment.

We have by this opinion removed the procedural barriers which

have prevented the appellants from seeking relief by due course of law. In so doing, we have equalized 'again the responsibility of all levels of government in this state for torts when engaged in a proprietary function. However, we intimate no evaluation whatsoever as to the merits of the appellants' tort and implied warranty claims against Wichita State University. In *Johnson v. Municipal University of Omaha*, 184 Neb. 512, 169 N. W. 2d 286, 288, it was said:

"The issue of immunity and the issue of liability are two complete and distinct issues. The removal of governmental immunity in a specified area of tort actions does not impose absolute liability in place of immunity. It only makes a governmental entity subject to the same rules which apply to non-governmental persons or corporations who do not have the shield of sovereign governmental immunity. . . ." (p. 514.)

Nor should this opinion be regarded as an evaluation of whether the appellants will be able to support their allegations by proof.

Likewise, the district court erred in concluding the Aviation Services Agreement signed by Mr. Katzenmeyer on behalf of Wichita State University and Mr. Danielson on behalf of Golden Eagle Aviation was an unenforceable contract between the University and Golden Eagle and that the plaintiffs could not maintain an action against the University as third party beneficiaries.

There are genuine issues of material fact which remain as to both the third party beneficiaries and tort claims of the appellants.

The judgment is reversed and the case remanded to the district court for further proceedings not inconsistent with this opinion.

## APPENDIX A

## AVIATION SERVICES AGREEMENT

THIS AGREEMENT, made this July 21 day of 1970, between Golden Eagle Aviation, Inc., a corporation, hereinafter referred to as "Contractor," and Wichita State University, hereinafter referred to as "Customer";

WITNESSETH:

WHEREAS, Customer has leased (or, prior to the commencement of the services provided for herein, will have leased), from a third party, the following described aircraft:

ONE DOUGLAS DC-6B

hereinafter referred to as "the Aircraft"; and

WHEREAS, Customer desires to have Contractor provide, with respect to the Aircraft, the services specified below, upon the terms

and conditions hereinafter set forth, and Contractor is willing so to do;

Now, THEREFORE, Customer and Contractor do hereby agree as follows:

1. *Services:* Contractor shall provide the following services for the Aircraft during the period of time commencing on September 11, 1970, and ending on November 14, 1970:

(*a*) A fully qualified flight crew to fly the Aircraft to and from such points within the Continental United States as Customer may direct (or, if an itinerary is attached hereto, to fly the Aircraft in accordance with said itinerary), said flight crew to consist of:

Captain
First Officer
Flight Engineer
Two Cabin Attendants

(*b*) The following specified in-flight catering services. See attached schedule and itinerary titled "1970—Football Travel Plans".

(*c*) All fuel, oil and other fluids necessary for the operation of the Aircraft pursuant to their Agreement.

(*d*) Routine maintenance on the Aircraft.

2. *Compensation:* As consideration for Contractor's providing the above specified services, Customer shall pay to Contractor a total sum of $24,388.60.

3. *Payment:* Customer shall pay to Contractor the sum of $12,-194.30 upon signing this Aviation Service Agreement, this sum to constitute an advance against the total of $24,388.30.

In addition, the Customer shall pay to the Contractor on October 5, 1970 the sum in addition to the advance to constitute payment in full of the Aviation Service Agreement.

4. *Contractor's Personnel:* Contractor's personnel engaged in the performance of this Agreement shall for all purposes remain employees of Contractor. All members of the flight crew shall be licensed and fully qualified in every respect to operate the Aircraft.

5. *Delays or Cancellations:* Contractor shall not be responsible for delays or cancellations occasioned by labor disputes, weather, acts of God, mechanical failure or any other factors beyond the control of Contractor.

6. *Insurance:* Customer, at its expense, shall provide for pas-

senger . . . liability . . . insurance with limits satisfactory and in accordance with the FAA and CAB regulations and shall furnish proof thereof to Contractor.

7. *Entire Agreement:* This Agreement, and any schedules or exhibits attached hereto, constitutes the entire agreement between Customer and Contractor and shall not be modified or amended except by writing signed by both parties.

8. *Counterparts:* This Contract may be executed in numerous counterparts, each such counterpart having the same effect as the original contract.

9. *Choice of Law:* This Contract shall be construed in all respects pursuant to the Laws of the State of Oklahoma.

In Witness Whereof, the parties hereto have executed this Agreement the day and year first above written.

GOLDEN EAGLE AVIATION, INC.
By /s/ *Bruce J. Danielson,*
Vice President.

ATTEST:
/s/ *Floyd W. Farmer,*
Secretary

WICHITA STATE UNIVERSITY
By /s/ *Bert Katzenmeyer.*

KAUL, J., dissenting: I cannot agree with the complete about-face of the majority concerning the constitutional authority of the legislature to deal with governmental immunity.

Time does not permit nor is a discussion of the pros and cons of governmental immunity pertinent to my dissent. Concededly, there are valid arguments on both sides of the issue. In my view the critical question confronting us herein is simply whether this court should assume the ultimate and exclusive power to deal with the subject. Prior to today's decision the constitutional authority of the legislature to deal with governmental immunity has been recognized many times and never questioned by this court. (*Neely v. St. Francis Hospital & School of Nursing,* 192 Kan. 716, 391 P. 2d 155, dealt with immunity of charitable institutions, a clearly distinguishable doctrine based upon different considerations.)

In *Woods v. Kansas Turnpike Authority,* 205 Kan. 770, 472 P. 2d 219, this court unqualifiedly accepted the legislature's enactment of K. S. A. 46-901 and 46-902 in response to our decision in *Carroll v. Kittle,* 203 Kan. 841, 457 P. 2d 21. In an abrupt and complete re-

versal of its previous position the court today has declared 46-901 and 46-902 to be constitutionally void.

My position and the previous status of the law in this jurisdiction are well-expressed by Justice O'Connor speaking for a unanimous court, in response to the legislature's enactment of K. S. A. 46-901 and 46-902, in *Woods*. In the opinion it is stated:

"In practically every opinion on the subject of governmental immunity we have suggested to the legislature that the extent to which the doctrine is to be applied lies within its province. This court, through *Carroll*, issued an open invitation to the lawmakers to give consideration to the whole area of governmental immunity instead of satisfying themselves, as in the past, with a series of sporadic statutes operating in separate, isolated areas of activity. At the same time *we unequivocally recognized the authority of the legislature to control the entire field of governmental immunity*, including matters covered by judicial decision, and suggested that body was in a better position than this court to do so. The 1970 legislature promptly accepted the challenge and responded with the enactment of Senate Bill No. 465 (L. 1970, ch. 200 [now K. S. A. 46-901 and 46-902]). . . .

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"By this enactment the legislature, in its wisdom, has expressed the public policy of this state in the field of governmental immunity pertaining to the state and its various agencies. . . ." (p. 773.) (Emphasis supplied.)

Further in the opinion it is stated:

"Certainty and stability in the law are always desirable and in the long run best serve the bench, the bar and the citizens of the state. Now that the legislature has spoken in a comprehensive manner on the subject of immunity for the state and its agencies—something lacking at the time of *Carroll*—we believe sound judicial policy dictates that further inroads by this tribunal into the immunity doctrine as it relates to liability of the state is neither warranted nor justified. . . ." (p. 774.)

Subsequent to the *Woods* case Chief Justice Price speaking for a unanimous court in *Daniels v. Kansas Highway Patrol*, 206 Kan. 710, 482 P. 2d 46, again referred to our decision in *Carroll v. Kittle*, supra, and the aftermath thereof in these words:

". . . The decision did, however, (syl. 4) recognize the authority of the legislature to control the entire field of governmental immunity—including matters covered by judicial decisions. The broad-sweeping effect of the decision was of short duration, however, for, as pointed out in *Woods v. Kansas Turnpike Authority*, 205 Kan. 770, 773, 472 P. 2d 219, the next session of the legislature promptly accepted the challenge by enacting Chapter 200, Laws of 1970, now appearing at K. S. A. 1970 Supp. 46-901, *et seq.*, effective March 26, 1970." (p. 713.)

Although *Allen v. City of Ogden*, 210 Kan. 136, 499 P. 2d 527, did not directly deal with the constitutionality of the statutes in

question, Chief Justice Fatzer, again speaking for a unanimous court, referred to the *Carroll* decision in these words:

". . . *Carroll* recognized the authority of the Legislature to control the entire field of governmental immunity, including matters covered by judicial decision. . . ." (p. 138.)

Obviously, constitutional authority of the legislature to control the entire field of governmental immunity as a public policy matter was, prior to today's decision, settled law in this state. The majority opinion severely limits, if it does not totally obliterate, legislative prerogative. As indicated in the *Woods* opinion, the previous position of this court was based upon the proposition that governmental immunity was a matter of basic public policy encompassing far-reaching consequences—fiscal and otherwise—and that the legislature was in a better position than this court to express the policy of the people of the state concerning the same. Implicit in prior decisions is the principle that, for purposes of tort liability, the state, its agencies and other governmental entities may, because of multivarious differences, be reasonably classified differently from private persons—thus satisfying constitutional prerequisites of equal protection and due process. I know of no reasons of public policy which dictate or justify this sudden about-face in judicial attitude concerning a matter of such far-reaching consequences.

Moreover, I cannot agree that the record before us shows that the transportation, by Wichita State of students engaged in university athletics, to be a proprietary function within the boundaries of that concept delineated by prior decisions of this court.

I therefore respectfully dissent.

The judgment of the trial court should be affirmed.

FROMME, J., joins in the foregoing dissent.

FONTRON, J., dissenting: I wish to record my agreement with the views so clearly expressed by Mr. Justice Kaul with respect to the court's abrupt and dramatic turn-about-face in striking down K. S. A. 46-901 and 46-902 as being constitutionally invalid.

FROMME, J., joins in the foregoing dissent.

REPORTER'S NOTE:

Case No. 47,363 and case No. 47,706 consolidated and rehearing granted.